IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| **RYAN, LLC**,<br><br>      *Plaintiff*,<br><br>v.<br><br>**INTERNAL REVENUE SERVICE;** the Hon. **DANNY WERFEL**, Commissioner of the Internal Revenue Service, in his official capacity,<br><br>      *Defendants*. | Civil Action No. 3:25-cv-00078-B |

**FIRST AMENDED COMPLAINT**

1. Plaintiff Ryan, LLC brings this civil action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, against the Final Rule published by the Internal Revenue Service ("IRS") on January 14, 2025, entitled *Micro-Captive Listed Transactions and Micro-Captive Transactions of Interest*, 90 Fed. Reg. 3,534 (Jan. 14, 2025). A copy of the Rule is available at https://perma.cc/8S37-L6XY and is attached as Exhibit A. The Rule determines that certain transactions involving captive insurance companies formed under 26 U.S.C. § 831(b), which the Rule refers to as "micro-captive transactions," must be reported under 26 U.S.C. § 6011 because they are abusive or have the potential for abuse. The Rule exceeds the statutory authority of the IRS, is arbitrary and capricious, and is otherwise contrary to law. This Court should vacate and set aside the Rule.

2. Congress has plainly expressed its intent to encourage the use of captive insurance companies, including by expanding the § 831(b) captive program in the Protecting Americans from Tax Hikes Act ("PATH Act"). *See* Consolidated Appropriations Act, 2016, H.R. 2029, 114th

Cong., Div. Q (2015). In the PATH Act, Congress also took steps to prevent potential abuses of captive insurance companies, specifically by making § 831(b)'s tax advantages unavailable to an insurance company if more than 20% of its premiums were attributable to a single policyholder. *See id.*

3. The Rule imposes additional limitations and burdens upon the use of captive insurance companies that Congress has not authorized. These new limitations and burdens, conjured up by the IRS through administrative fiat, do not reflect a reasonable attempt to limit potential abuses of captive insurance companies while respecting Congress's intent to support the use of captive insurance companies under § 831(b).

4. The Rule thus violates the Administrative Procedure Act, which prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" as well as those that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

## JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because Ryan's claims arise under federal law and under 28 U.S.C. § 1346 because an agency of the United States is a defendant. Specifically, Ryan's claims implicate the Internal Revenue Code, the PATH Act, and the APA.

6. Venue is proper under 28 U.S.C. § 1391(e)(1) because an agency of the United States is a Defendant, and Plaintiff Ryan, LLC maintains its principal place of business in the U.S. District Court for the Northern District of Texas and in this Division (Dallas, Texas).

7. This Court is authorized to award the requested relief under 5 U.S.C. § 706; 15 U.S.C. § 634(b)(1); 28 U.S.C. §§ 1651, 2201, and 2202; and its inherent equitable powers.

8.      The APA waives the sovereign immunity of the United States for the relief sought in this Complaint. 5 U.S.C. § 702.

## PARTIES

9.      Plaintiff Ryan, LLC is a global tax consulting firm that employs over 2,500 professionals in dozens of offices in the United States. Headquartered in Dallas, Texas, Ryan provides an integrated suite of federal, state, local, and international tax-consulting services on a multi-jurisdictional basis. One of Ryan's related business services involves the establishment and management of captive insurance companies for select clients. The Rule causes Ryan imminent financial injury because it discourages current clients and potential clients from establishing and maintaining captive insurance companies. Accordingly, the Rule will have a negative impact on Ryan's tax-consulting business, including by preventing Ryan from developing and expanding its business in the micro-captive sector. Thus, Ryan will lose revenue, profits, and goodwill.

10.     Defendant Internal Revenue Service is an agency of the United States. The IRS is within the Department of the Treasury, which is a department of the United States. The IRS issued the Rule.

11.     Defendant Danny Werfel is the Commissioner of the Internal Revenue Service. He is sued in his official capacity.

## BACKGROUND

12.     In April 2023, the IRS issued a proposed rule entitled, *Micro-Captive Listed Transactions and Micro-Captive Transactions of Interest*, 88 Fed. Reg. 21,547 (Apr. 11, 2023). The IRS sought comments on the proposed rule.

13.     Plaintiff Ryan, LLC submitted comments in opposition to the proposed rule. *See* Exhibit B.

14. More than 100 other interested parties submitted comments, the vast majority of which opposed the proposed rule. Dozens of commenters explained the utility of micro-captive arrangements to small and medium-sized businesses, including the ability to insure against catastrophic but low-frequency events for which coverage is otherwise unaffordable or completely unavailable. Similarly, dozens of commenters identified flaws in the proposed rule's rigid, arbitrary criteria for identifying abusive micro-captive arrangements—particularly the proposed rule's across-the-board 65% loss-ratio threshold. Commenters explained these criteria are illogical, unsupported in fact or theory, and indistinguishable from an IRS notice previously struck down as arbitrary and capricious. *See CIC Servs., LLC v. IRS*, 592 F. Supp. 3d 677, 687 (E.D. Tenn. 2022).

15. On January 14, 2025, the IRS published the Rule. 90 Fed. Reg. 3,534.

16. The Final Rule defines the situations in which a transaction involving a captive insurance company is a "listed transaction" or a "transaction of interest" for purposes of Treasury Regulation § 1.6011-4(b)(2) and (b)(6).

17. Under the new regulations promulgated by the Rule, a transaction involving a captive insurance company is a "listed transaction" for purposes of Treasury Regulation § 1.6011-4(b)(2) if: (1) during the most recent five taxable years, the captive "directly or indirectly" made any portion of payments under an insurance contract available as financing to an owner, an insured, or a related person; and (2) during the most recent ten taxable years, the captive's "liabilities incurred for insured losses and claim administration expenses . . . [were] less than 30 percent of the amount equal to premiums earned . . . less policyholder dividends." 26 C.F.R. § 1.6011-10(c)(1)-(2).

18. A "listed transaction" is a transaction "that is the same as or substantially similar to one of the types of transactions that the [IRS] has determined to be a tax avoidance transaction and

identified by notice, regulation, or other form of published guidance as a listed transaction." 26 C.F.R. § 1.6011-4(b)(2). The IRS presumes listed transactions to be abusive. *See* 26 U.S.C. § 6707A(c)(2).

19. The Rule provides that a transaction involving a captive insurance company is a "transaction of interest" if, during the most recent ten taxable years, the captive's "amount of liabilities incurred for insured losses and claim administration expenses [was] less than 60 percent of the amount equal to premiums earned . . . less policyholder dividends paid." 26 C.F.R. § 1.6011-11(c)(2). A transaction involving a captive insurance company can also be a "transaction of interest" if during the most recent five taxable years, the captive insurer "directly or indirectly" made any portion of payments under an insurance contract available as financing to an owner, an insured, or a related person. 26 C.F.R. § 1.6011-11(c)(1).

20. A "transaction of interest" is a transaction "that is the same as or substantially similar to one of the types of transactions that the IRS has identified by notice, regulation, or other form of published guidance as a transaction of interest." 26 C.F.R. § 1.6011-4(b)(6). The IRS deems transactions of interest to have the potential for abuse.

21. Taxpayers who participate in "reportable transactions," which include "listed transactions" and "transactions of interest," are subject to reporting requirements under Treasury Regulations. 26 C.F.R. §§ 1.6011-4(a), (b)(1), (b)(2), (b)(6).

22. Taxpayers and material advisors who fail to follow these reporting requirements may be subject to penalties. *See* 26 U.S.C. §§ 6707, 6707(A), & 6708.

23. The Rule thus makes a categorical determination that transactions involving a captive insurance company are "listed transactions" if: (1) the captive insurer's provided financing to

an owner, insured, or related party; and (2) the captive insurer operates with a loss ratio lower than 30%.

24. But, for "transactions of interest," the Rule requires only that the captive insurer have provided financing to an owner, insured, or related party *or* the existence of a loss ratio of 60% or less.

25. These are not legitimate bases to brand micro-captive transactions under § 831(b) as "listed transactions" or "transactions of interest." The IRS has not provided evidence, facts, or data to prove that its chosen criteria are tailored in any way to identify abuses of the mechanism Congress provided in § 831(b). If any such evidence existed, it would be readily available to the IRS from years' worth of taxpayer filings. In fact, the IRS's previous notice classifying micro-captive transactions as "transactions of interest" was arbitrary and capricious because "[t]he administrative record in this case simply does not include underlying facts and data showing that micro-captive insurance arrangements have a potential for tax avoidance or evasion." *CIC Servs., LLC*, 592 F. Supp. 3d at 687. Yet, once again, the IRS cites nothing. *See* 90 Fed. Reg. at 3,538 (referencing the "IRS's long-standing positions with respect to abusive micro-captive" transactions but citing no facts, data, or evidence supporting those positions). The IRS has nevertheless determined that the micro-captive industry is using § 831(b) as a tax-avoidance mechanism.

26. Under the Rule's financing provision, a § 831(b) micro-captive is treated as a "listed transaction" if the captive used premium income in a financing transaction with its insured or affiliates of the insured within the previous five years and the captive insurer has a loss ratio of less than 30% (meaning liabilities and claim administration expenses were less than 30 percent of premiums earned). 26 C.F.R. § 1.6011-10(c)(1)-(2). Financing transactions include loans, guarantees, or other uses of the captive's capital for the benefit of the insured that is not taxable as income

6

or gain to the insured. The rule thus presumes any loan-back or other financing transaction is a tax-avoidance transaction, if combined with a loss ratio of less than 30%.

27. The Rule's reliance on the existence of loans or other financing transactions to presume that a captive arrangement is a tax-avoidance scheme does not reflect a reasonable effort to determine whether a micro-captive program provides valid insurance. There is nothing inherently improper or abusive about a captive's use of premium income to provide valid loans or other financing to an insured or its affiliate. To the contrary, the Tax Court has deemed a captive's financing transaction appropriate, in the context of § 831(a), where the captive invested substantially all of its funds in the treasury stock of its parent corporation while retaining a right to resell the stock at any time for its purchase price. *Rent-A-Center, Inc. v. Commissioner*, 142 T.C. 1 (2014). It is illogical to subject § 831(b) micro-captives to a different standard than applies to § 831(a) captives or commercial insurance companies. And, in the Final Rule, the IRS admits that "the economic reality" for a particular "related-party financing" could be a "bona fide financing arrangement." 90 Fed. Reg. at 3,546. Given that, as Ryan explained in its comment, the IRS should determine whether a particular micro-captive financing arrangement has the potential for abuse, based upon the specific terms and conditions of the financing. But, in the Final Rule, the IRS offers no explanation for its refusal to adopt a case-by-case analysis of related-party financing.

28. The decision to prohibit or discourage financing by micro-captive insurance companies under § 831(b) belongs to Congress, not the IRS. But Congress has repeatedly encouraged the use of captive-insurance companies. The IRS's attempt to overrule that congressional judgment through a blunt, ill-considered regulation is contrary to law and arbitrary and capricious.

29. The Rule's use of a loss ratio of less than 30% as a metric for identifying listed transactions or a 60% loss ratio for identifying transactions of interest is also arbitrary, capricious,

and contrary to law. These arbitrarily assigned loss-ratio thresholds have no basis in the statute or case law, and they do not reflect the business realties of valid micro-captive arrangements.

30. Micro-captives are often used to provide insurance coverage for infrequent or catastrophic risks that is typically not available through the commercial insurance market or is available only at an unreasonable cost. Examples include the risk of business interruption caused by a pandemic, professional liability claims, hazardous waste, smoke damage to a vineyard, and avian flu infection at an egg producer. In addition to insuring against unique risks, micro-captives can provide significant cost-savings compared to the price of insurance in the traditional marketplace, which commonly incorporates the insurer's acquisition costs, marketing and brokerage commissions, administrative expenses, and profit to the insurer. Finally, micro-captive insurance companies are attractive to small businesses because they allow those businesses to receive operating and underwriting profits, rather than paying premiums to a commercial insurance company.

31. Because micro-captives are commonly used to cover low-frequency but high-severity risks, their loss ratios can be expected to fall far below the loss ratios of traditional insurance companies, which often insure high-frequency, low-severity risks. Moreover, micro-captives are small insurance companies owned by small businesses with small written premiums and comparatively few policyholders. By structure and design, micro-captives have lower loss ratios than traditional insurance companies. That is because micro-captives must build a surplus of capital to cover the low-frequency but catastrophic losses they are designed to insure.

32. It is well-recognized in the industry that micro-captives historically have lower loss ratios than traditional insurance companies. But this does not indicate that micro-captives do not provide genuine insurance against real risk. As multiple commenters explained, loss ratio is an

improper metric to identify abusive transactions because the absence of loss is not evidence of the absence of risk.

33. The Rule's 30% loss-ratio threshold for listed transactions and a 60% threshold for transactions of interests are based on an apples-to-oranges comparison to dissimilar insurers, reflecting an unreasonable conception of the expected losses for typical micro-captive coverages. The IRS relied on the National Association of Insurance Commissioner ("NAIC")'s industry report on industry-wide loss ratios. *See* 90 Fed. Reg. at 3,542. But that report is skewed by the inclusion of large commercial insurers operating businesses very different from § 831(b) micro-captive insurance companies. And although one commenter identified an alternative source collecting the "average loss and loss administration expense ratios for small insurance companies"—which share many characteristics with captive insurance companies—the IRS rejected that data as including companies with "vastly different claims characteristics than micro-captives." *Id.* (citation omitted). But the NAIC report also includes companies with vastly different claims characteristics. The IRS makes no effort to explain why the NAIC data is a better touchstone than the data on small insurance companies. That is arbitrary and capricious.

34. The Rule's 60% loss-ratio threshold for transactions of interest is substantially higher than the loss ratios experienced by the vast majority of smaller companies comparable in size to § 831(b) captives and by the vast majority of low-frequency, high-severity insurance lines of business. The IRS admits that the "average" loss ratio for insurance companies, after excluding certain high frequency, low severity coverages, is 66 percent. *Id.* The IRS does not explain why a loss-ratio that approximates the industry average is a legitimate measure of transactions that may be abusive.

35. To the contrary, many legitimate insurance companies will, by definition, have a loss ratio below that "average," and sometimes far below it. The Tax Court has recognized, for instance, that an arrangement may qualify as insurance for federal tax purposes even when the cumulative loss ratio is lower than 34%. *See R.V.I. Guaranty Co., Ltd. & Subsidiaries v. Commissioner*, 145 T.C. 209, 216 (2015). The Final Rule admits that a legitimate loss-ratio of as low as "28%" can exist. *See* 90 Fed. Reg. at 3,541. The Final Rule's 60% loss-ratio threshold for transactions of interest will thus necessarily subject many legitimate captive insurers to burdensome scrutiny by the IRS. The IRS has not explained why using a 60% loss ratio to define transactions of interest is reasonable, given the certainty that many legitimate captive insurers with loss-ratios slightly lower than average will be covered.

36. Likewise, the loss-ratio thresholds in the Final Rule may conflict with state regulatory requirements, which establish minimum capitalization requirements for captives and regulate dividends and loan backs. *See, e.g.*, Okla. Stat. tit. 36, § 6470.6(D); Tenn. Code Ann. §§ 56-13-105(b), -106; *see also* 90 Fed. Reg. at 3,536 (admitting that "State regulators establish solvency requirements for insurers licensed in their domicile"). The Final Rule dismisses this concern on the grounds that "[c]aptive insurers would avoid insolvency in the same way they always have[] … by insuring risks that are duly selected and duly reserved for in accordance with sound business judgment and the regulatory requirements of their domicile." 90 Fed. Reg. at 3,545.

37. That misses the point. The Final Rule *interferes* with captive insurer's ability to charge actuarially sound premiums sufficient to accumulate adequate reserves and surplus by forcing micro-captives to comply with an arbitrarily set minimum loss ratio. The Final Rule thus unnecessarily compels captive insurers formed under § 831(b) to risk being unable to pay claims. When micro-captives cannot meet their claim obligations, the insured is forced to absorb the loss.

Unlike commercial carriers, micro-captives do not have access to state guaranty funds, meaning the state will not cover unpaid claims if a micro-captive becomes insolvent. The Rule's loss-ratio threshold thus undermines the purpose of § 831(b)—encouraging prudent risk management by small businesses. Indeed, the loss-ratio thresholds in the Final Rule would have prevented many captives from paying claims related to the COVID-19 pandemic, leading to the closure of many more small businesses that created captives precisely to protect against this type of black swan event.

38. The Rule violates the APA because it exceeds the IRS's statutory authority, it is not in accordance with law, and it is arbitrary and capricious. 5 U.S.C. § 706(2)(A), (C). The Rule imposes burdens and limitations on activities that Congress permits; it discourages business activities that Congress intended to promote; and it is not reasonably structured to identify and prevent the abuses that the IRS claims to address.

## FIRST CAUSE OF ACTION

### Violation of the APA: Excess of Statutory Authority

39. The allegations in paragraphs 1–38 are expressly incorporated herein as if restated in full.

40. The APA requires a reviewing court to "hold unlawful and set aside agency action" that is "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(C).

41. As explained above, the Rule exceeds the IRS's statutory authority to identify transactions that have "a potential for tax avoidance or evasion," 26 U.S.C. § 6707A(c)(1), because its overbroad criteria will classify a substantial number of legitimate micro-captive insurers operating

11

consistently with the purpose of § 831(b) as presumptively or potentially illegitimate tax-avoidance schemes. In other words, the Rule means that a valid election authorized by Congress in the Internal Revenue Code is presumptively abusive if it fails a test that Congress never authorized.

## SECOND CAUSE OF ACTION

### Violation of the APA: Contrary to Law

42. The allegations in paragraphs 1–41 are expressly incorporated herein as if restated in full.

43. The APA requires a reviewing court to "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

44. As explained above, the Rule is contrary to law because, in spite of Congress's clearly demonstrated intent to ensure the continued availability of captive insurance programs, the Rule effectively imposes new and additional limitations and burdens on captives that were not authorized or intended by Congress, particularly after passage of the PATH Act.

45. By increasing the potential that captive insurance programs will be identified as listed transactions or transactions of interest, the Rule dissuades taxpayers from establishing or maintaining captives under section 831(b), undermining Congress's intent that these programs should flourish and thrive.

46. In practice, the Rule will effectively nullify Congress's decision, in section 831(b), to incentivize responsible risk management through micro-captive insurance companies.

## THIRD CAUSE OF ACTION

### Violation of the APA: Arbitrary or Capricious

47. The allegations in paragraphs 1–46 are expressly incorporated herein as if restated in full.

48. The APA requires a reviewing court to "hold unlawful and set aside agency action" that is "arbitrary, [or] capricious." 5 U.S.C. § 706(2)(A).

49. In formulating the Rule, the IRS failed to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). The "APA requires that the IRS examine relevant facts and data supporting th[e] conclusion" that "micro-captive insurance arrangements have the potential for tax avoidance or evasion." *CIC Servs., LLC*, 592 F. Supp. 3d at 687. But IRS has made no effort to explain why the relevant facts and data supports its belief that captive insurance companies present particular potential for tax avoidance or evasion. At most, the IRS cites several cases where the Tax Court found that particular micro-captive transactions were abusive. *See* 90 Fed. Reg. at 3,538. But "[s]imply including cases in the administrative record that suggest certain tax structures could be abusively employed is not synonymous with examining relevant facts and data." *CIC Servs., LLC*, 592 F. Supp. 3d at 687.

50. In fact, the IRS has made no effort to explain why the relevant data supports the rigid criteria it selected to distinguish abusive transactions from permissible uses of § 831(b). *See Id.* (vacating a materially identical IRS notice as arbitrary and capricious for the same reason). To the extent the IRS relies on any data, it arbitrarily chose data involving nonanalogous insurance companies. *See supra* ¶ 33.

51. As explained above, the Rule is arbitrary and capricious because the criteria it uses to classify micro-captive transactions as "listed transactions" or "transactions of interest" are not based on a reasonable understanding of micro-captive insurance transactions or a reasonable effort

13

to identify abusive transactions. Indeed, many commenters explained that the Rule sets an improper standard because the criteria selected by the IRS are certain to designate legitimate micro-captive arrangements as abusive tax-avoidance schemes. As a result, the Rule is not reasonably calculated to accomplish the Rule's ostensible goal of targeting abuses of § 831(b).

52. In particular, the Final Rule's reliance on loss-ratio thresholds is arbitrary and capricious. As explained, the insurance industry recognizes that captive-insurance companies will typically have lower loss ratios compared to traditional insurance companies. That is because captive insurers often cover low-frequency but high-severity risks. *See supra* ¶¶ 29-33. Multiple comments therefore explained that loss ratio should not be used to identify abusive transactions and suggested more appropriate tests. For example, commenters proposed that the IRS should identify abusive transactions by determining whether the method of computing premiums was proper. Specifically, commenters recommended that the IRS abandon the loss-ratio test and replace it with a requirement that micro-captives have a qualified actuary certify the reasonableness of their premiums.

53. Moreover, the IRS "entirely failed to consider an important aspect of the problem" that the Rule is intended to address. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. For example, the IRS has failed to consider the near-certain risk—noted by several comments to the proposed Rule—that the criteria imposed by the Rule will make it difficult for micro-captives to maintain a sufficient surplus as required by state laws and therefore less likely that they will be able to pay claims. *See supra* ¶¶ 36–37.

## REQUEST FOR RELIEF

THEREFORE, Ryan respectfully requests that the Court grant relief and judgment as follows:

(A)   Declare that the Rule is unlawful in violation of the APA.

(B)     Vacate and set aside the Rule.

(C)     Enjoin Defendants from enforcing the Rule.

(D)     Award reasonable attorneys' fees and allowable costs, including under the Equal Access to Justice Act, 5 U.S.C. § 504, and 28 U.S.C. § 2412.

(E)     Grant Plaintiff such other and further relief to which it is justly entitled at law and in equity.

Dated: January 17, 2025

Respectfully submitted,

*/s/ Scott A. Keller*

Steven P. Lehotsky (*pro hac vice* forthcoming)
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW Suite 700
Washington, DC 20001
steve@lkcfirm.com
T: (512) 693-8350
F: (512) 727-4755

Scott A. Keller (Texas Bar # 24062822)
Matthew H. Frederick (Texas Bar # 24040931)
LEHOTSKY KELLER COHN LLP
408 West 11th Street, 5th Floor
Austin, TX 78701
scott@lkcfirm.com
T: (512) 693-8350
F: (512) 727-4755

Drew F. Waldbeser (*pro hac vice* forthcoming)
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
drew@lkcfirm.com
T: (512) 693-8350
F: (512) 727-4755