# Exhibit B



Three Galleria Tower
13155 Noel Road
Suite 100
Dallas, TX 75240-5090
Tel. 972.934.0022
Fax 972.934.2091
www.ryan.com

VIA ELECTRONIC SUBMISSION

Internal Revenue Service
CC:PA:LPD:PR (REG-109309-22)
Room 5203
P.O. Box 7604
Ben Franklin Station
Washington, D.C. 20044

      Re:    Comments to REG-109309-22: Micro-Captive Listed
                 Transactions and Micro-Captive Transactions of Interest

To Whom It May Concern:

      Ryan, LLC ("Ryan") respectfully submits the following comments with respect to the proposed regulations under Internal Revenue Code ("Code")[1] section 6011, published in the Federal Register on April 11, 2023, addressing micro-captive insurance arrangements identified as listed transactions and transactions of interest for purposes of section 6011 (the "Proposed Regulations").[2]

      Ryan is a global tax consulting firm that employs over 2,500 professionals in dozens of offices in the United States. Headquartered in Dallas, Texas, Ryan provides an integrated suite of federal, state, local and international tax services on a multijurisdictional basis. One of Ryan's related business services involves the establishment and management of captive insurance companies for select clients. Ryan provides qualified and comprehensive support to create and manage captive insurance companies that are designed to qualify under section 831(b). In coordination with licensed, third-party actuaries, Ryan assesses client data and business goals to assist clients in determining the viability of a captive insurance program to meet their business needs and in identifying insurance risks that fall outside of clients' current insurance policies.

**Overview**

      The Proposed Regulations seek to identify certain transactions involving section 831(b) captive insurance companies (which the Proposed Regulations refer to as "micro-captive transactions") as "listed transactions" or "transactions of interest" under the Code's reportable transaction regime. Under section 6011, the Secretary may adopt regulations requiring taxpayers to "make a return or statement according to the forms and regulations prescribed by the Secretary" and to disclose "the information required by such forms or regulations."[3] Regulations issued under section 6011 impose disclosure requirements on taxpayers who participate in "reportable

---

[1] Unless otherwise noted, all references to "section" are to the Internal Revenue Code of 1986, as amended and currently in effect.
[2] 88 Fed. Reg. 21547 (proposed Apr. 11, 2023).
[3] 26 U.S.C. § 6011(a).

Internal Revenue Service
June 12, 2023
Page 2

transactions," which include "listed transactions" and "transactions of interest."[4] A "listed transaction" is one "that is the same as or substantially similar to one of the types of transactions that the [IRS] has determined to be a tax avoidance transaction and identified by notice, regulation, or other form of published guidance as a listed transaction," and a "transaction of interest" is one "that is the same as or substantially similar to one of the types of transactions that the IRS has identified by notice, regulation, or other form of published guidance as a transaction of interest."[5] Sections 6111 and 6112 impose disclosure and list-maintenance requirements on "material advisors" with respect to reportable transactions.[6] Taxpayers and material advisors who fail to follow these requirements may be subject to penalties.[7]

The Proposed Regulations identify micro-captive arrangements as listed transactions if the section 831(b) captive:[8] (1) within the last five years, made a guarantee, a loan, or other transfer of its capital to an insured or an owner of the insured, or to a person related to the insured or owner; *or* (2) has been in existence for ten or more years, and has a loss ratio of less than 65% over the last ten years.[9] Alternatively, a micro-captive arrangement would be a transaction of interest if the captive has been in existence for less than ten years and has a loss ratio of less than 65%.[10] Under the Proposed Regulations, the loss ratio is measured as liabilities incurred for losses and claim administration expenses during the computation period over premiums earned less policyholder dividends paid over the computation period (*i.e.*, 10 years, or if less, the period of the captive's existence).[11]

To identify abusive arrangements, the Proposed Regulations rely on four court cases that found that the underlying captives did not qualify as insurance. However, none of those decisions relied on valid loans or loss ratios.[12] In particular, the preamble to the Proposed Regulations explains that in abusive arrangements "the manner in which the contracts are interpreted,

---

[4] Treas. Reg. §§ 1.6011-4(a), (b)(1), (b)(2), (b)(6).
[5] Treas. Reg. §§ 1.6011-4(b)(2), (b)(6). After issuance of these regulations under section 6011, Congress passed section 6707A, which defines a "reportable transaction" as "any transaction with respect to which information is required to be included with a return or statement because, as determined under regulations prescribed under section 6011, such transaction is of a type which the Secretary determines as having a potential for tax avoidance or evasion." 26 U.S.C. § 6707A(c)(1). Section 6707A defines a "listed transaction" consistent with its definition under the section 6011 regulations. *See* 26 U.S.C. § 6707A(c)(2).
[6] 26 U.S.C. §§ 6111(a), 6112(a).
[7] *See* 26 U.S.C. §§ 6707, 6707A, 6708.
[8] A section 831(b) captive falls within the scope of the Proposed Regulations if it has at least 20% of its assets or the voting power or value of its outstanding stock or equity interests directly or indirectly owned, individually or collectively, by an insured, an owner of the insured, or a person related to an insured or owner. *See* Prop. Treas. Reg. §§ 1.6011-10(b)(1), 1.6011-11(b)(1).
[9] 88 Fed. Reg. at 21561, 21562.
[10] *Id.* at 21563.
[11] Prop. Treas. Reg. §§ 1.6011-10(c)(2) and -11(c).
[12] In *Avrahami v. Commissioner*, 149 T.C. 144 (2017), when considering whether the company satisfied the requirement for insurance in its commonly accepted sense, the court found it problematic that the captive invested *only* in illiquid long-term loans to related parties and failed to get the required regulatory approval for the related-party loans. But this extreme fact pattern does not support a conclusion that loans by captives to related parties should never be permitted.

Internal Revenue Service
June 12, 2023
Page 3

administered and applied is inconsistent with arm's length transactions and sound business practices" and that the "[c]aptive typically does not behave as an insurance company would," and that this demonstrates that the transaction is not insurance.[13] But there is a mismatch between the identified abuse in those cases and the factors set forth in the Proposed Regulations, which are unrelated to the perceived abuse. Moreover, the Proposed Regulations *do not* define what is a valid micro-captive arrangement and will inevitably sweep in valid captive programs as listed transactions and transactions of interest. The designation of these captive arrangements as listed transactions or transactions of interest will have a significant chilling effect on these programs, resulting in a substantial decrease in the use of micro-captive insurance companies, contrary to the clear intent of Congress.[14]

If the Treasury Department ("Treasury") and the Internal Revenue Service ("IRS") were to adopt the Proposed Regulations as written, there is significant risk that a reviewing court would strike down such regulations as arbitrary and capricious.[15] An "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"[16] It is respectfully submitted that the Treasury and the IRS have not met this requirement in this instance. As discussed herein, neither the proposed loss ratio threshold nor the proposed financing provisions are grounded in statute, case law, guidance, or evidence before the agency. Indeed, Congress has continued to reiterate its support for section 831(b) captives, as well the prior IRS Notice that was substantially similar to the Proposed Regulations has been ruled to be arbitrary and capricious.[17] The Proposed Regulations do not set forth a "reasoned analysis . . . [that] consider[s] the 'alternative[s]' that are 'within the ambit of the existing [policy].'"[18] Accordingly, if adopted, the Proposed Regulations are unlikely to satisfy the Administrative Procedure Act's threshold requirements and may be vacated if challenged.

It is respectfully submitted that Treasury and the IRS should either withdraw the Proposed Regulations as currently drafted or revise the Proposed Regulations to identify reasonable criteria for designating section 831(b) transactions as reportable transactions and to provide safe-harbor criteria that would carve out certain qualifying micro-captive arrangements from the reporting requirements for listed transactions and transactions of interest. This would not only provide certainty to micro-captives across the country and ensure the realization of the Congressional intent of section 831(b), but it would also allow the IRS to better focus its enforcement actions and resources on arrangements that have the potential for abuse.

---

[13] 88 Fed. Reg. at 21555.
[14] *See infra* p. 4-6 (discussing section 831(b)'s legislative history).
[15] *See* 5 U.S.C. § 706.
[16] Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).
[17] *See CIC Serv., LLC v. IRS*, 592 F.Supp 3d 677, 681 (E.D. Tenn. 2022).
[18] Dep't of Homeland Sec. v Regents of the Univ. of Calif., 140 S.Ct. 1891, 1913 (2020) (quoting State Farm, 463 U.S. at 51).

Internal Revenue Service
June 12, 2023
Page 4

**Congress Continues to Support Section 831(b) Captive Insurance Programs**

Prior to the passage of the Tax Reform Act of 1986 ("TRA"), mutual property and casualty insurance companies were "classified into three categories depending upon the amount of the gross receipts."[19] The lowest tier was exempt from tax, the second tier was generally taxed only on investment income (or could be subject to special rules with graduated rates), and the third tier was taxed on both investment and underwriting income.[20] In enacting the TRA, Congress determined that the rules for mutual insurance companies were "inordinately complex" and needed to be "simplified," and that it was "appropriate to eliminate the distinction between small mutual companies and other small companies" and "extend[] the benefit of the small company provision to all eligible small companies, whether stock or mutual."[21]

Based on those findings, Congress amended section 831(b) to provide that non-life insurance companies earning between $350,000 and $1,200,000 in premiums could elect to pay taxes only on investment income at the standard corporate rate.[22] Thus, Congress specifically extended the benefit of section 831(b) to stock insurance companies.

The Proposed Regulations refer to section 831(b) insurance companies that provide insurance to related entities as "micro-captives." These micro-captives typically benefit their related insured entities by providing insurance that might not otherwise be available in the commercial insurance market, or by providing it at a lower price. These captive insurance arrangements allow businesses to protect against unexpected risks, such as impacts from a global pandemic, the loss of key customers, suppliers, or employees, diseases that affect livestock, or plagues destroying crops. In addition, rather than paying premiums to unrelated third parties, the captive programs allow insurance profits to be retained by the captive insurance company.

Although section 831(b) captive insurance companies are permitted by the Code, the IRS raised concerns about the use of micro-captives in early 2015 by placing them on the IRS's "Dirty Dozen" list as a potentially abusive tax shelter.[23] And yet, at the same time the IRS was placing them on the "Dirty Dozen" list, Congress was demonstrating its continued support for these captives, culminating with the inclusion of certain provisions in the Protecting Americans from Tax Hikes Act ("PATH Act")[24] that expanded the section 831(b) captive program. Additionally,

---

[19] H.R. Rep. No. 99-426, at 677 (1985).
[20] *See id.*
[21] *Id* at 678.
[22] *See* Tax Reform Act of 1986 § 1024(a)(4), 26 U.S.C. § 831. *See also* Staff of Joint Comm. on Tax'n, General Explanation of the Tax Reform Act of 1986, at 620 (May 4, 1987). TRA section 1024 also amended Code section 501(c)(15) to provide that non-life insurance companies with net written premiums (or if greater, direct written premiums) of $350,000 or less for the taxable year would be tax-exempt organizations.
[23] Abusive Tax Shelters Again on the IRS "Dirty Dozen" List of Tax Scams for the 2015 Filing Season, IR-News Rel., 2015-19 (Feb. 3, 2015) (explaining that in abusive micro-captive structures, there are often "poorly drafted 'insurance' binders and policies to cover ordinary business risks or esoteric, implausible risks for exorbitant 'premiums,'" and that "[u]nderwriting and actuarial substantiation for the insurance premiums paid are either missing or insufficient.").
[24] *See* Consolidated Appropriations Act, 2016, H.R. 2029 114th Cong., Div. Q. § 333 (2015).

Internal Revenue Service
June 12, 2023
Page 5

Congress explicitly addressed what it believed to be the underlying issue causing the abuse of 831(b) programs.

Indeed, S. 905, the bill that would later be included in the PATH Act, recognized "that the $1,200,000 ceiling on net or direct written premiums . . . ha[d] not been adjusted for inflation since it was set in 1986."[25] Accordingly, the bill increased the limit to $2,200,000 and included a mechanism to adjust the cap for inflation. Speaking in support of this legislation, Senator Charles Grassley highlighted the beneficial use of this insurance for his constituents:

> The small mutual insurance inflation update is important for many rural communities in Iowa and across the country who rely on Small Mutuals or Farm Mutuals to obtain property insurance. Frequently, rural residents have difficulties obtaining property insurance through traditional insurance companies, given their unique circumstances.
>
> Farm mutuals help fill the void by providing insurance for property that may otherwise be left uninsured.
>
> However, the ability of Farm Mutuals to fill this void has become threatened since the threshold that qualifies them for special tax treatment was never indexed to inflation. . . . As a result, many small companies are approaching the current $1.2-million limit, and both they and their customers will be adversely impacted if it is not raised.[26]

The bill also included certain provisions to address perceived abuse. Prior to its introduction, the Senate Finance Committee held a hearing on the bill.[27] That unintroduced version included a diversification rule providing that the section 831(b) election would not be available to a company if more than 20% of its premium was attributable to any one policyholder.[28] When S. 905 was introduced in April (two months after the mark-up), however, that diversification requirement was replaced with a requirement for the Secretary to deliver a report to Congress to explain the "abuse of captive insurance companies" in estate planning and include recommendations for legislation to address such abuse.[29]

Ultimately, when the amendment to section 831(b) was enacted in the PATH Act,[30] the provision adopted both the diversification requirements and the expansion of the section 831(b) cap limits. The PATH Act did not include the request for a Treasury report on the abuses under section 831(b). The diversification requirements addressed the concern expressed by the Finance Committee to "narrow eligibility to elect the alternative tax in a manner intended to address abuse

---

[25] S. Rep. No. 114-16 (2015).
[26] *Open Executive Session to Consider Various Tax Bills*, 114th Cong. 56 (2015) (statement of Sen. Chuck Grassley, Member, Sen. Comm. on Finance).
[27] See Staff of the Joint Committee [Descrip of Chairman's Mark] JCX-21-15 Feb. 9, 2015.
[28] *Id.*.
[29] S. 905, 114th Cong., § 1(b)(1st Sess. 2015).
[30] *See* Consolidated Appropriations Act, 2016, Pub. L. 114-113, Div. Q. § 333 (2015).

Internal Revenue Service
June 12, 2023
Page 6

potential . . . ."[31] The Treasury report requirement, on the other hand, which was not adopted, would have included legislative recommendations for addressing any such abuses."[32] In other words, by adopting the diversification requirements and by striking the language directing Treasury to provide a report, Congress, itself, addressed what it believed to be the underlying issues with section 831(b) that could result in abuse.

The history of the PATH Act's changes to section 831(b), and Senator Grassley's statement set forth above reflect Congress's intentional and ongoing support for micro-captive insurance arrangements. Indeed, the provision passed out of the Senate Committee on Finance unanimously. Thus, as recently as 2015, Congress approved and expanded the use of micro-captive insurance companies.

Despite clear Congressional intent to ensure the continued availability of captive insurance programs, the Proposed Regulations effectively create new limitations and burdens on captives that were not authorized by Congress—particularly after the passage of the PATH Act. Given the potential to be identified as a listed transaction or as a transaction of interest, the Proposed Regulations will dissuade taxpayers from establishing or maintaining captives under section 831(b), undermining Congress's intent that these programs be allowed to exist and thrive.

**The Proposed Regulations Are Inconsistent with the Tax Law Requirements for Insurance Companies**

For more than 40 years, the courts and the IRS have undertaken "facts and circumstances" analyses to determine whether premiums paid to related insurance companies are deductible, and whether those arrangements qualify as insurance for federal income tax purposes. While most of the cases and IRS guidance have not been specific to micro-captive insurance companies under section 831(b), the general principles for qualification as insurance are the same, *i.e.*, there must be insurable risk, risk shifting, risk distribution, and the arrangement must follow commonly accepted notions of insurance. Despite this history and the existing law, Treasury and the IRS now seek to upend decades of precedent with the Proposed Regulations, which, without legislative authority, would impose additional limitations on captive insurance companies seeking to qualify under section 831(b).

The Proposed Regulations would effectively subject section 831(b) captive insurance companies to a different and harsher set of rules than other insurance companies that fall under different provisions of the Code, such as sections 501(c)(15) and 831(a). Respectfully, there is no support for this disparate treatment, and also no support for casting a one-size-fits-all approach to determining whether a section 831(b) captive will be identified as a listed transaction or transaction of interest. As developed through caselaw and IRS guidance, the test for whether an arrangement

---

[31] Staff of Joint Comm. on Tax'n, Technical Explanation of the Protecting Americans from Tax Hikes Act of 2015, House Amendment #2 to the Senate Amendment to H.R. 2029, at 201 (Dec. 17, 2015).
[32] S. 905, 113th Cong. § 1(b) (2015).

qualifies as insurance is a facts and circumstances analysis. Therefore, using arbitrary factors not grounded in established law, as a litmus test for reportable transactions, is not appropriate.

In Rev. Rul. 2002-89, Rev. Rul. 2002-90, and Rev. Rul. 2002-91, the IRS examined whether arrangements between related companies qualify as insurance for federal income tax purposes and provided some safe harbors for the presence of risk distribution. Specifically, those rulings examine and apply the holding of *Helvering v. LeGierse*, 312 U.S. 531 (1941), which states that for an arrangement to constitute insurance for federal income tax purposes, both risk shifting and risk distribution must be present.

These safe harbor revenue rulings illustrate that where a captive insurance company is owned by a parent company, and the parent company is 90% of the insureds, the IRS position is that the arrangement will not constitute insurance. However, where a parent company accounts for less than 50% of the total risks borne by the captive and pays less than 50% of the premiums, the arrangement will generally qualify as insurance. Similarly, where a parent company owns an insurance subsidiary and that subsidiary insures a significant number of other subsidiaries of the parent company, or insures sufficient third-party risks consistent with the requirements of the rulings, such arrangement will generally qualify as insurance for federal tax purposes.

Additional factors the IRS has identified in determining whether a captive program qualifies as insurance include "whether the parties that insured with the captive truly face hazards; whether premiums charged by the captive are based on commercial rates; whether the validity of claims was established before payments are made; and whether the captive's business operations and assets are kept separate from the business operations and assets of its shareholders."[33] Critically, the IRS explained that "to determine the nature of an arrangement for federal income tax purposes, *it is necessary to consider all the facts and circumstances in a particular case, including not only the terms of the arrangement, but also the entire course of conduct of the parties.*"[34]

Following the issuance of the safe harbor rulings in 2002, the IRS also requested comments from interested parties on various aspects of captive programs. For instance, in Notice 2005-49, the IRS sought input on (among other items) circumstances under which the qualification of an arrangement between related parties as insurance may be affected by a loan back of amounts paid as premiums.[35]

Despite this history, as well as the enactment of the PATH Act in 2015 to increase the amount of premiums allowed for section 831(b) companies, in 2016 the IRS issued Notice 2016-66, which characterized most micro-captive arrangements as transactions of interest.[36] Specifically, the IRS deemed section 831(b) arrangements as transactions of interest if the insurance company (1) incurred losses and claim administration expenses during the most recent

---

[33] Rev. Rul. 2002-91, 2002-2 C.B. 991 (2002).
[34] Rev. Rul. 2005-40, 2005-2 C.B. 4 (2005) (emphasis added).
[35] IRS Notice 2005-49, 2005-2 C.B. 14 (2005).
[36] IRS Notice 2016-66, 2016-47 I.R.B. 745 (2005).

Internal Revenue Service
June 12, 2023
Page 8

five-year period of less than 70% of premiums earned minus policyholder dividends paid (the "70% loss ratio"); or (2) directly or indirectly made available as financing to the insured, owner of the insured, or related person (collectively, the "recipient"), in a transaction that did not result in taxable income to the recipient, any portion of the payments received by the captive under the insurance contract (*i.e.*, the untaxed premium amounts).

Notice 2016-66 substantially ignored the decades of precedent in response to previous notices. Indeed, the Notice's 70% loss ratio was conjured out of thin air. The idea of a loss ratio as a test for insurance was found nowhere in the case law or IRS rulings, nor was it something the IRS previously identified as a relevant determining factor. Similarly, although a question about loans was raised in Notice 2005-49, Treasury and the IRS provided no rationale why the existence of financing, *regardless of the circumstances*, should automatically make the captive arrangement a transaction of interest. These factors are unsupported and wholly disconnected from the key determinants of insurance under existing guidance. It is unclear why Treasury and the IRS decided to single out these factors as determinative, and abandon the historic (and correct) approach of examining the facts and circumstances of each captive to determine whether it qualifies as insurance for federal income tax purposes.

The same flaws in the now invalidated[37] Notice 2016-66 continue in the Proposed Regulations with only minor changes. Tellingly, Notice 2016-66 acknowledged that the "Treasury Department and the IRS lack sufficient information to identify which § 831(b) arrangements should be identified specifically as a tax avoidance transaction and may lack sufficient information to define the characteristics that distinguish the tax avoidance transactions from other § 831(b) related-party transactions."[38] And while the IRS has been gathering captive insurance information since the issuance of Notice 2016-66, through the examination of hundreds (or thousands) of captive insurance arrangements, the Proposed Regulations do not distinguish good from bad, relying instead on Notice 2016-66's factors that a court ruled are arbitrary and capricious.[39]

In summary, the approach in the Proposed Regulations does not identify legitimate criteria—or relevant data to support such criteria—to assess the merits of section 831(b) captive programs. For this reason, we respectfully submit that a court would be likely to find the Proposed Regulation to be arbitrary and capricious.[40] Whereas the earlier revenue rulings established safe harbor factors for captives to consider in determining validity as insurance, the Proposed Regulations make no attempt to reconcile or consider these factors or others that might be relevant, and instead broadly paint captives as potentially invalid transactions based on untested and unrelated criteria. These flaws should be addressed by Treasury and the IRS in the final rule to ensure that Congressional intent is realized and that section 831(b) captive programs continue to be a viable option for taxpayers.

---

[37] *See CIC Servs, LLC v. IRS*, 592 F.Supp.3d at 681-83.
[38] IRS Notice 2016-66, 2016-47 I.R.B. 745 (2016).
[39] *CIC Servs, LLC* at 687.
[40] *See CIC Servs, LLC* at 684-685 (finding IRS Notice 2016-66 to be arbitrary and capricious for "fail[ing] to provide underlying facts and data").

Internal Revenue Service
June 12, 2023
Page 9

**<u>A Micro-Captive's Provision of Financing Should Not Trigger a Listed Transaction</u>**

The Proposed Regulations focus on two criteria to determine if a micro-captive arrangement is a listed transaction or a transaction of interest. The first criteria is the provision of financing (*e.g.*, loan, guarantee, or other transfer of the captive's capital) to an insured, owner of the insured, or other related parties where the financing transaction did not result in taxable income to the recipient. If this type of financing was provided by the captive within the last five years, the micro-captive arrangement is automatically considered a listed transaction, regardless of the circumstances. The Proposed Regulations assume that the presence of financing is a clear indication that the captive arrangement is a tax avoidance scheme.[41] But the provision of financing, standing alone, is not a reasonable one-size-fits-all litmus test to determine whether the micro-captive program is valid insurance. Instead, the Proposed Regulations should be modified either to : 1) adopt a "facts and circumstances" approach that examines the effects and terms of the financing; or 2) establish reasonable criteria to distinguish permissible financing from that which will trigger reporting requirements for a listed transaction.

The Proposed Regulations do not establish—or attempt to establish—why the existence of financing dictates that a micro-captive arrangement should be a listed transaction. Instead, the preamble asserts that a captive "may also use its premium income for purposes other than administering and paying claims under the contract(s), including routing funds that have not been taxed to the Insured or a person related to the Insured or its owners."[42] Caselaw does not support a conclusion that providing valid financing, which regulators allow, indicates tax avoidance, tax abuse or the disqualification of the micro-captive arrangement as insurance.[43] And we respectfully submit that any such prohibition on financing for section 831(b) micro-captive insurance companies should be only within the dominion of Congress. Imposing such a restriction and triggering a listed transaction through a regulation is not supported by existing law and is therefore arbitrary and capricious.

A more appropriate approach to determine whether financing arrangements indicate abuse would be to examine the specific terms and conditions of the financing. For instance, Treasury and the IRS could consider: (1) whether the loans carry enforceable terms and conditions that are commercially reasonable; (2) whether the loans are statutorily and regulatorily permitted where the insurance company is organized; and (3) whether it is commercially reasonable to expect the loans to be repaid. Alternatively, Treasury and the IRS could establish safe harbor criteria for permissible captive financing (*e.g.*, if the loan is made available from the captive's surplus above a specified percent of annual premiums), while allowing other arrangements to be reviewed for abuse on a case-by-case basis.

---

[41] *See* 88 Fed. Reg. at 21557 ("Presence of the financing factor in related party micro-captive insurance transactions indicates tax avoidance and abuse of Captive's status as a section 831(b)-electing insurance company.").
[42] *Id.*
[43] *Id.*

Internal Revenue Service
June 12, 2023
Page 10

The provision of financing, alone, from a micro-captive to a related party should not dictate whether the micro-captive arrangement is a listed transaction. Without more, such designation is arbitrary. The Proposed Regulations should be amended either to 1) remove this criteria, 2) establish detailed criteria that would consider the merits of the financing offered, or 3) specifically identify the factors needed for permissible financing arrangements.

**The 65% Loss Ratio is Inappropriate and Not Grounded in the Realities of Valid Captives**

The Proposed Regulations also use loss ratio as the second criterion to determine whether a micro-captive arrangement should be a listed transaction or transaction of interest. Similar to the financing factor, this loss ratio criterion is not grounded in the statute or caselaw, nor is it reflective of the business realities associated with valid micro-captive arrangements. Instead, it appears that Treasury and the IRS developed the criteria based on loss ratios achieved by large commercial insurers with different types of businesses. These are not comparable, and the 65% loss ratio set forth in the Proposed Regulations is entirely inappropriate for section 831(b) micro-captive insurance companies.[44]

The proposed loss ratio does not make sense for several reasons. First, the proposed loss ratio is higher than much of the entire property-casualty insurance industry found in most states. Second, the vast majority of smaller companies that are comparable in size to section 831(b) captives, and high risk/low frequency insurance lines of business, have loss ratios substantially lower than 65%. Third, the Tax Court has recognized that an arrangement may qualify as insurance for federal tax purposes even when the company's cumulative loss ratio is less than 34%.[45] Finally, policyholder dividends have never been used as a factor for determining whether a transaction constitutes insurance and should not be included in determining a loss ratio.

The proposed loss ratio is not reflective of the realities of the property-casualty insurance industry.

One useful source of information on loss and loss adjustment expense ("LAE") ratios to premium is the National Association of Insurance Commissioners ("NAIC") Report on Profitability by Line and State published in 2021 (the "NAIC Report").[46] This report evaluates premium, loss, LAE, and underwriting expense data for all insurance companies required to submit financial statements to the NAIC by state and line of business/coverage.

The data for the period 2013-2021 demonstrates why the 65% loss ratio for section 831(b) captives is misguided, as follows:

---

[44] *See* 88 Fed. Reg. at 21557 (identifying other types of insurance loss ratios to justify the proposed loss-ratio for 831(b) insurance).
[45] *R.V.I. Guaranty Co., Ltd. & Subsidiaries v. Commissioner*, 145 T.C. 209, 216 (2015)
[46] National Association of Insurance Commissioners, Report on Profitability by Line by State in 2021 (Jan. 2023), https://content.naic.org/sites/default/files/publication-pbl-pb-profitability-line-state.pdf.

Internal Revenue Service
June 12, 2023
Page 11

1) Twelve states have a nine-year average loss ratio of below 65% for all coverages combined. In other words, twelve states' insurance programs would fail the IRS test in their entirety.

2) More than half (51.2%) of all categories of insurance lines by state have a nine-year loss and LAE ratio of less than 65%. In other words, 444 different line-state combinations from Alabama homeowners' insurance to Wyoming warranty have a loss and LAE ratio of less than 65% and would fail the 65% loss and LAE ratio standard set forth in the Proposed Regulations.

3) If personal auto, commercial auto and accident and health insurance are excluded (based on the fact that these lines have loss ratios in excess of 65% in the vast majority of all states and may not be analogous to the types of coverage provided by section 831(b) captive insurance companies), the percentage of line-state combinations with loss ratios below 65% increases to 63.7% of all remaining state-coverage combinations. In fact, 12.4% of the state-coverage combinations have loss ratios of 25% of earned premium or less. This information is summarized in the following graph.



In short, even when combining the loss experience of the entire property-casualty insurance industry by state and coverage type, including multibillion dollar U.S. and international insurance companies, a majority of the nine-year average loss and LAE ratios are below the 65% proposed standard.

<u>Similar coverage lines have substantially lower loss ratios than 65%.</u>

Internal Revenue Service
June 12, 2023
Page 12

The industry-level approach is flawed because it considers lines such as automobile, accident, health, homeowners, and workers compensation that have dramatically different claims characteristics than the coverages micro-captives frequently provide. Therefore, a more appropriate comparison might be to focus on the insurance industry loss experience for comparable lines of coverage.

The analysis below of loss and defense and cost containment experience (DCC or DCCE) for the years 2010 – 2020 by insurance company (consolidated by insurance group as applicable) for six coverages: Boiler & Machinery, Burglary & Theft, Earthquake, Fidelity, Surety, and Other Liability Claims-Made[47] demonstrates the appropriateness of comparing loss experience for comparable lines. Micro-captives offer many of these types of coverages and therefore have similar loss and loss ratio distributions.

The analysis reveals that in many instances, even very large insurance companies providing these coverages produced loss ratios of 0% to 25% for the entire nine-year period. In fact, from 2012 to 2020 the California Earthquake Authority produced a loss and DCC ratio of approximately 0.2% of premium which totaled approximately $4.5 billion.

For the Boiler & Machinery line, the average loss ratio for the industry in total was 40.5% for the nine-year period. Furthermore, only 4.8% of insurance companies experienced a loss and DCC ratio over 65%. Therefore 95% of the insurance companies writing this coverage would not meet the Proposed Regulations' 65% loss ratio standard for this coverage. In fact, most Boiler & Machinery insurers (62.1%) produced a nine-year loss and DCC ratio of 25% or less. This is summarized in the following chart.

---

[47] NAIC Report at 14. As defined by the NAIC at https://content.naic.org/sites/default/files/industry-product-code-matrices-pc.pdf: Boiler and machinery coverage is coverage for the failure of boilers, machinery and other electrical equipment. Benefits include (i) property of the insured, which has been directly damaged by the accident; (ii) costs of temporary repairs and expediting expenses; and (iii) liability for damage to the property of others. Coverage also includes inspection of the equipment. Earthquake coverage provides property coverage for commercial or personal items. Burglary and theft coverage is for property taken or destroyed by break-in and entering the insured's premises; burglary or theft; forgery or counterfeiting; fraud; and off-premises exposure. Fidelity coverage is a bond or policy covering an employer's loss resulting from an employee's dishonest act (e.g., loss of cash, securities, valuables, etc.). Surety coverage is a three-party agreement where the insurer agrees to pay a second party (the obligee) or to make complete an obligation in response to the default, acts, or omissions of a third party (the principal or obligor). Other Liability-Claims-Made policies cover insured events which are reported within the effective date of the policy, but are not covered by other policies, for losses such as Cyber, Fiduciary, Umbrella, Professional Errors & Omissions, Personal Injury, Pollution, Employment Practices, Kidnap & Ransom, Employee Benefits Liability, Directors & Officers, Contractual Liability, and Commercial General Liability.

Internal Revenue Service
June 12, 2023
Page 13



For the Burglary & Theft line, the average loss ratio for the industry in total was 33.9% for the nine-year period. Furthermore, only 11.6% of insurance companies experienced a loss & DCC ratio over 65%. In fact, most Burglary & Theft insurers (69.7%) produced a nine-year loss & DCC ratio of 25% or less. This is summarized in the following chart.



For the Earthquake line, the average loss ratio for the industry in total was **1.1%** for the nine-year period across $25.1 billion in premium. Furthermore, not a single earthquake insurance company experienced a loss & DCC ratio over 65%. In fact, almost all Earthquake insurers

Internal Revenue Service
June 12, 2023
Page 14

(98.8%) produced a nine-year loss & DCC ratio of 25% or less. This is summarized in the following chart.



For the Fidelity line, the average loss ratio for the industry in total was 43.8% for the nine-year period. Furthermore, only 10.8% of insurance companies experienced a loss & DCC ratio over 65%. In fact, most Fidelity insurers (55.9%) produced a nine-year loss & DCC ratio of 25% or less. This is summarized in the following chart.



Internal Revenue Service
June 12, 2023
Page 15

For the Surety line, the average loss ratio for the industry in total was 20.0% for the nine-year period. Furthermore, only 7.1% of insurance companies experienced a loss & DCC ratio over 65%. In fact, most Surety insurers (75.6%) produced a nine-year loss & DCC ratio of 25% or less. This is summarized in the following chart.



For the Other Liability Claims-Made line, which is one of the most common coverages provided by micro-captives, the average loss ratio for the industry in total was 64.0% for the nine-year period. However, only 31.5% of insurance companies experienced a loss & DCC ratio over 65%. In fact, 32.2% of all Other Liability Claims-Made insurers produced a nine-year loss & DCC ratio of 25% or less. This is summarized in the following chart.



Internal Revenue Service
June 12, 2023
Page 16

<u>The majority of similar-sized insurance companies have loss-ratios lower than 65%.</u>

Another issue with the industry-level approach is that it includes very large insurance companies such as AIG, Progressive, State Farm, Travelers, Zurich and others. These companies have incomparably larger volumes of claims, and large underwriting, actuarial and data analytics departments. These companies are not relevant comparators to micro-captives because of their scale and complexity. Therefore, a more appropriate comparison might be to focus on the insurance industry loss experience for size appropriate micro-captive comparable companies, *i.e.*, the smaller insurance companies.

AM Best Company provides lists grouped by size of comparable companies. AM Best assigns these groupings based on capital and surplus, rather than annual premium, which provide a more reasonable group of insurance companies to compare to micro-captives. For this evaluation, the analysis focuses on insurance companies that are currently in size Groups I – IV:

    Group I:     $1 Million or Less
    Group II:    $1 Million to $2 Million
    Group III:   $2 Million to $5 Million
    Group IV:    $5 Million to $10 Million

Of note, these small insurance companies write personal auto insurance, homeowners' insurance and other coverages that have vastly different claims characteristics than micro-captives. Nonetheless, even with this qualification, 61% of the small insurance companies providing data to the NAIC and AM Best have nine-year average loss and LAE ratios that would fail the 65% loss ratio threshold in the Proposed Regulations. In fact, 21.3% of these insurance companies have a nine-year average loss ratio of less than 25%. This is summarized in the following chart.



Internal Revenue Service
June 12, 2023
Page 17

      This data demonstrates the unreasonableness of the 65% loss ratio in the Proposed Regulations. We respectfully submit that the Proposed Regulations should be amended to eliminate the loss ratio as a determinant of whether a micro-captive arrangement constitutes a listed transaction or transaction of interest. Alternatively, the loss ratio threshold should be decreased significantly to a more appropriate level based on expected losses for typical micro-captive coverages.

<u>The Tax Court has allowed low loss ratios for valid insurance programs.</u>

      Notably, the Tax Court has recognized the validity of an insurance program with a loss ratio much lower than the 65% ratio set forth in the Proposed Regulations. In *R.V.I. Guaranty Co., Ltd. & Subsidiaries v. Commissioner*, 145 T.C. 209 (2015), an insurance company (RVI) provided coverage for the diminution of value of certain leased assets at the end of the lease.[48] The IRS determined that RVI's policies were not insurance, asserting that the coverage provided by RVI was for investment risk, rather than insurance risk.[49] The Tax Court disagreed and found in favor of RVI, determining that the coverage constituted insurance. In reaching that conclusion, the court examined RVI's historic loss ratios, which from 2000 to 2006 was 27.7% (on a cumulative basis), and was 34% from 2000 to 2013.[50] Annual loss ratios fluctuated considerably, being less than 1% in many years, and exceeding the 65% threshold set in the Proposed Regulations in only one year (during the 2008 financial crisis).[51] The Tax Court recognized that because RVI insured against low-frequency/high-severity risks (similar to earthquakes and major hurricanes), "[RVI's] loss ratio in some years was extremely low."[52] Despite this fact, the Tax Court concluded that "the level of risk transferred to [RVI] under these policies was more than sufficient to treat them as 'insurance contracts' for Federal income tax purposes."[53]

<u>Dividends have never been used to determine whether an arrangement qualifies as insurance.</u>

      The Proposed Regulations allow policyholder dividends to be used as a mechanism to increase a captive's loss ratio. However, we respectfully submit that this methodology is not grounded in practice in the insurance industry, nor is it determinative of what constitutes valid insurance.

      The payment of policyholder dividends is not a valid factor in determining whether an arrangement qualifies as insurance for federal tax purposes. The inclusion of this appears to be Treasury and the IRS pushing micro-captives into disbursing funds held within the captive, which would otherwise be available to cover low-frequency/high-severity risks. We respectfully submit that the implicit encouragement to distribute such funds to policyholders, rather than to the

---

[48] 145 T.C. at 210-12.
[49] *Id.* at 210.
[50] *Id.* at 216.
[51] See id.
[52] *Id.* at 227.
[53] *Id.* at 228.

Internal Revenue Service
June 12, 2023
Page 18

shareholders of the captive, demonstrates the IRS's unjustified and unreasonable overreach. There is no authority for the Proposed Regulations to effectively require such distributions to policyholders to avoid having a reportable transaction. This type of restriction falls within the jurisdiction of Congress.

Micro-captives are often used to cover catastrophic risks that are not typically covered by the commercial insurance market. Accordingly, as demonstrated in the data above, and as similarly reflected in *R.V.I.*, the loss ratios can be expected to be much lower than those of traditional insurance companies. Thus, if the Proposed Regulations maintain the use of a loss ratio as a determining factor, the ratio should be more reflective of the actual types of risks that micro-captives insure. To do otherwise is arbitrary, ignores reality, and imposes an inappropriate requirement on legitimate micro-captive programs contrary to the intent of Congress.

**<u>Treasury and the IRS Should Propose Regulations Identifying Legitimate Micro-Captives</u>**

Instead of adopting the Proposed Regulations, it is respectfully requested that Treasury and the IRS should withdraw the Proposed Regulations and re-propose new regulations that identify the characteristics of qualified micro-captive insurance arrangements. Such safe harbor provisions would ensure the continued viability of micro-captive programs under section 831(b), consistent with Congress's intent, while allowing the IRS to focus its enforcement efforts on abusive transactions instead of legitimate micro-captives.

The adoption of the Proposed Regulations will chill an entire industry established by Congress. We respectfully submit that the preamble's claim that the IRS is "not aware of any non-abusive transactions for which disclosure was required under Notice 2016-66 as a result of the 70-percent loss ratio factor set forth therein"[54] is untrue. We are aware of circumstances where the IRS has effectively conceded the validity of programs where the taxpayer would have been subject to disclosure under the 70% loss ratio requirement in Notice 2016-66.

The criteria established by the Proposed Regulations for listed transactions and transactions of interest are unrelated to the issues of abuse identified by Treasury and the IRS, *e.g.*, the need for arm's length transactions and sound business practices. Treasury and the IRS should focus on criteria that demonstrates the presence or absence of insurance under the relevant law. For example, the IRS could craft guidance that requires micro-captives to meet the capitalization requirements of the jurisdiction in which it is organized; that establishes risk distribution and risk shifting criteria similar to those found in the 2002 revenue rulings; that provides an impartial appeals process;[55] or that requires the certification of premiums by credentialed actuaries.

---

[54] 88 Fed. Reg. at 21557.
[55] Unfortunately, many taxpayers with valid 831(b) programs are forced into settlement because of the IRS's approach of 'guilty until proven innocent.' Specifically, the IRS initiates examinations of micro-captives with the assumption that the triggers for disclosure are determinative of abuse. Taxpayers are offered a settlement at the inception of the exam and are not allowed a hearing at Appeals independent of the settlement offer. Without any consideration of a

Internal Revenue Service
June 12, 2023
Page 19

**Conclusion**

      Treasury and the IRS have an opportunity to set forth standards to determine whether a micro-captive arrangement has a potential for abuse, such that it should be subject to an examination, or whether it has the proper indicia of insurance under the federal income tax law. Unfortunately, the Proposed Regulations do neither. As this comment letter has outlined, Treasury and the IRS should withdraw the Proposed Regulations as currently drafted or revise the Proposed Regulations to identify reasonable criteria for designating section 831(b) transactions as reportable transactions and provide reasonable safe-harbor criteria for qualifying micro-captive arrangements that would exempt such transactions from the reporting requirements for listed transactions and transactions of interest. For the foregoing reasons, we respectfully submit that the Treasury and the IRS should withdraw the Proposed Regulations.

      Thank you for your consideration of these comments.

      Respectfully submitted

*G. Brint Ryan*

G. Brint Ryan
Chairman and CEO
Ryan, LLC

---

taxpayer's facts, the IRS asserts that "taxpayers shouldn't expect to receive better terms in Appeals." And unfortunately, if a taxpayer does decide to challenge the IRS's examination, from an economic point of view, even if they win in litigation, they lose. Accordingly, most taxpayers take the settlement, and the government collects more tax than is legally due. To rectify this, the IRS should allow Appeals to perform its proper function of resolving issues on their merits where taxpayer facts differ from the cases the government has won—this is an easy and fair solution for the IRS.