UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RYAN, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| INTERNAL REVENUE SERVICE; | § | |
| the Hon. DANNY WERFEL, | § | |
| Commissioner of the Internal | § | Civil Action No. 3:25-CV-0078-B |
| Revenue Service, in his official | § | |
| capacity, | § | |
| | § | |
| Defendants. | | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the United States of America (the "Government")'s[1] Motion to Dismiss

(Doc. 18). Having reviewed the briefing and applicable law, the Court **GRANTS in part** and

**DENIES in part** the Government's Motion. The Court dismisses Ryan, LLC ("Ryan")'s first and

second causes of action **WITH PREJUDICE**. Ryan's third cause of action will proceed.

---

[1] When a party files suit against the Internal Revenue Service ("IRS") or its commissioner in his or her official capacity, the United States is the real party in interest. *See, e.g.*, *Esparza v. IRS*, No. 6:19-CV-018-C, 2019 WL 13199739, at *1 n.2 (N.D. Tex. Oct. 8, 2019) (Cummings, S.J.) (noting that the United States was substituted in as the only defendant in a case brought against the IRS and its commissioner); *Edomwande v. IRS*, No. 3:09-CV-1573-K, 2009 WL 7171940, at *1 (N.D. Tex. Dec. 17, 2009) (Sanderson, Jr., Mag. J.) (substituting in the United States as "the real party in interest in cases involving the IRS" (citations omitted)), *report and recommendation adopted*, No. 3:09-CV-1573-K, 2010 WL 92295 (N.D. Tex. Jan. 6, 2010) (Kinkeade, J.); *Connor v. Matthews*, 134 F. Supp. 2d 797, 799 (N.D. Tex. 2001) (Kendall, J.) ("[S]uits brought against IRS employees in their official capacities are treated as suits against the United States." (citations omitted)); *cf. Hawaii v. Gordon*, 373 U.S. 57, 58 (1963) (per curiam) (finding that a suit against the Director of the Bureau of the Budget was in fact a suit against the United States).

# I.

# BACKGROUND

This is a civil action brought under the Administrative Procedure Act ("APA") to vacate and set aside a final regulation issued by the United States Department of the Treasury ("Treasury"). The regulation at issue (the "Final Rule") requires the disclosure of certain transactions involving "captive insurance companies" to the IRS as "transactions of interest" or "listed transactions" if they meet applicable criteria. Ryan, a global tax consulting firm, raises three challenges to the regulation under section 706 of the APA: (1) that it was promulgated in excess of the Treasury's statutory authority, (2) that it is contrary to law, and (3) that it is arbitrary and capricious. Doc. 5, Am. Compl. ¶¶ 39-53.

A.    *26 U.S.C. § 831 and the PATH Act*

Under 26 U.S.C. § 831(a), the Federal Government imposes a tax on the taxable income—including both underwriting and investment income[2]—of non-life insurance companies. However, certain small insurance companies may elect to be subject to an alternative tax under § 831(b). This option, added by Congress in 1986, allows eligible insurance companies to be taxed only on the company's taxable *investment income,* and not its underwriting income (which is the net amount received as premiums), up to $2.2 million in exclusions per year as adjusted for inflation. *See* § 831(b)(1), (2)(A)(i), (2)(E); An Act to Reform the Internal Revenue Laws of the United States, Pub. L.   No. 99-514, Title X, § 1024(a)(4) (Oct. 22, 1986) (adding original § 831(b) alternative tax provision).

---

[2] *See* § 832(a) (defining "taxable income").

Congress has revisited § 831(b) as recently as 2015 with the Protecting Americans from Tax Hikes Act ("PATH Act"), where it required that an insurance company seeking to opt for the alternative tax structure under § 831(b) receive no more than 20% of its premium payments from any single policyholder. *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, Div. Q, § 333(a) (Dec. 18, 2015).

B.      *Captive and Micro-Captive Insurance Companies*

A captive insurance company is a specialized insurance company that is owned and controlled by the same entities that it insures. Captive insurance companies are used to provide insurance coverage for infrequent but catastrophic risks to a small number of affiliated companies, which coverage is either unavailable through commercial insurance or available but extraordinarily expensive. *See* Doc. 5, Am. Compl. ¶ 30. This includes coverage for events such as pandemics, professional liability claims, hazardous waste accidents, or other major but infrequent events. *See id.* Captives are attractive because when affiliated businesses make premium payments to their own captive insurance company—as opposed to a commercial insurer—those premiums do not need to include commissions and other associated fees. *See id.* Thus, the entire premium paid by a parent company to its captive insurance company, year over year, can accumulate and remain available to the parent in the case of a loss event. *Id.* Certain small captive insurance companies, called micro-captive insurance companies ("MCICs"), qualify for the favorable tax treatment provided under § 831(b). MCICs are thus particularly attractive because unlike other captive insurance companies,

premiums paid by the owner-insureds of MCICs are not taxed on the first $2.2 million in receipts. *See id.*

Because captives, including MCICs, need to pay out major but infrequent losses, they need to build a surplus of capital in years without major loss events. *See id.* ¶ 31. This means that unlike many commercial insurers, who pay out frequent but smaller claims in a given year, captive insurance companies may go several years collecting premiums without paying out for a loss. *See id.* Thus, a captive's "loss ratio"—a ratio of losses paid out over premiums received in a given year—may be much lower than a traditional commercial insurer. *See id.* ¶¶ 31-32.[3]

C.    *IRS's Scrutiny of MCICs*

By statute, Congress requires taxpayers and material advisors to disclose information concerning certain "reportable transaction[s]" to the IRS. 26 U.S.C. § 6707A(a), (c)(1). Reportable transactions are "of a type which the Secretary [of the Treasury, acting through the IRS] determines as having a potential for tax avoidance or evasion." *Id.*, subsec. (c)(1). Two categories of reportable transactions at issue here are "listed transaction[s]" and "transaction[s] of interest." *See* 26 C.F.R. § 1.6011-4(b)(2), (b)(6). The IRS *presumes abuse* in the case of listed transactions. *See* § 1.6011-4(b)(2). A transaction of interest, on the other hand, is one the IRS has flagged due to its *potential* for abuse. *See* § 1.6011-4(b)(6). Taxpayers, and their material advisors (individuals and entities that assist taxpayers with certain transactions), who engage in such transactions and fail to disclose information to the IRS regarding those transactions can face penalties. 26 U.S.C. §§ 6707(a), 6707A(a).

---

[3] The formula is simple. If an insurer pays out $50,000 in claims, but receives $100,000 in premiums in a given year, its loss ratio is 50%. A captive insurance company, who may not pay out any claims in a given year but still accumulates premiums, could have a loss ratio of 0% in such years.

In 2016, the IRS published Notice 2016-66, 2016-47 I.R.B. 745 (the "IRS Notice"). The IRS Notice informed taxpayers and material advisors that the IRS would identify certain transactions involving MCICs ("micro-captive transactions" or "MCTs") as transactions of interest moving forward, which would thereby need to be reported on tax forms. However, the IRS Notice was set aside for failure to comply with the APA in 2021. *See CIC Servs., LLC v. IRS* ("*CIC II*"), 592 F. Supp. 3d 677, 687 (E.D. Tenn. 2022) (finding that the IRS Notice was arbitrary and capricious because the IRS failed to reasonably explain how MCTs have the potential for tax avoidance or evasion), *on reconsideration*, No. 3:17-CV-110, 2022 WL 2078036 (E.D. Tenn. June 2, 2022).

D.    *The Proposed Rule*

Continuing the IRS's scrutiny of MCTs, the Treasury issued a proposed rule in April 2023, entitled Micro-Captive Listed Transactions and Micro-Captive Transactions of Interest, 88 Fed. Reg. 21,547 (proposed Apr. 11, 2023) (the "Proposed Rule"). In relevant part, the Proposed Rule set forth two criteria by which the Treasury would classify MCTs as "transactions of interest" or "listed transactions," and thereby would require taxpayers and their material advisors to disclose those transactions to the IRS. *See id.* Transactions of interest would include those involving an MCIC with an average ten-year loss ratio under 65%. *Id.* at 21,556. Listed transactions would include those involving an MCIC with an average ten-year loss ratio under 65%, or which in the most recent five taxable years the MCIC had made any of its capital available to an owner in the form of financing. *Id.* at 21,555-56.

The Treasury sought and received significant comments on the Proposed Rule, including from Ryan, who was also then in opposition. *See generally* Doc. 5-2, Ryan LLC Comments. Ryan took particular issue with the Proposed Rule's 65% loss ratio thresholds, commenting that the low-

loss-ratio nature of MCICs makes loss ratio (and especially a high loss ratio) a poor metric for whether a given MCT was abusive. *Id.* at 10-11. Ryan also questioned the Treasury's suspicion of MCTs and the lack of a clear basis for that suspicion. *Id.* at 4-6.

E.    *The Final Rule*

The Treasury published the Final Rule in January 2025. *See* Micro-Captive Transactions and Micro-Captive Transactions of Interest, 90 Fed. Reg. 3534 (Jan. 14, 2025) (codified at 26 CFR part 1). Under the Final Rule, a transaction involving an MCIC is a "listed transaction," and presumed abusive, if, for the most recent ten taxable years, the MCIC's loss ratio was under 30% *and* the MCIC, in the most recent five taxable years, provided any of its capital to an owner, insured, or related person in the form of financing (creating a conjunctive test). 26 C.F.R. § 1.6011-10(c). A transaction involving an MCIC is a "transaction of interest," and deemed potentially abusive, if for the most recent ten taxable years, the captive's loss ratio was under 60%, *or* if in the most recent five taxable years, the MCIC provided any of its capital to an owner, insured, or related person in the form of financing. 26 C.F.R. § 1.6011-11(c).

The Treasury asserts several justifications for the Final Rule. Regarding the Final Rule's listed transaction criteria, the Treasury explains that the 30% loss ratio for listed transactions was based on a 2015 Tax Court decision involving an insurance company which had an average ten-year loss ratio of 32%. 90 Fed. Reg. at 3541. The Treasury also believes the Final Rule's now-conjunctive test for listed transactions (combining both loss ratio and the owner-financing criteria) dispels concern over loss ratios or owner financing as individual bases for listed transaction status. *Id.* Regarding the Final Rule's transaction of interest criteria, the Treasury explains that the Final Rule's 60% loss ratio for transactions of interest was based on averages derived from national statistics of loss ratios for

commercial property and casualty insurance companies, with adjustments made for business lines that captive insurers cannot cover. *Id.* at 3542. Regarding the owner-financing criteria ("the Owner-Financing Factor")—relevant to both listed transactions and transactions of interest under the Final Rule—the Treasury explains that it was based on several Tax Court cases finding that certain MCTs with owner financing did not qualify as true insurance arrangements. *Id.* at 3551. Finally, addressing questions about the Treasury's general skepticism of MCICs as vehicles for fraud and abuse, the Treasury refers to "the IRS's long-standing positions with respect to abusive micro-captives as made public in annual Dirty Dozen tax schemes publications and case law." *Id.* at 3538.

F.    *The Present Action*

Ryan first challenged the Final Rule on January 10, 2025—several days before the Final Rule's publication. *See generally* Doc. 1, Compl. Ryan filed its First Amended Complaint on January 17, 2025, after the Final Rule was published. *See generally* Doc. 5, Am. Compl. The Government moved to dismiss Ryan's Amended Complaint in April 2025. *See generally* Doc. 18, Mot. Dismiss. The Court now considers that Motion.

## II.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(h)(3) requires a court to dismiss a plaintiff's complaint when the court determines it lacks subject matter jurisdiction. "Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citation omitted). "When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12

motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Id.* (citation omitted). "Once a defendant files a motion to dismiss under Rule 12(b)(1) and challenges jurisdiction, the party invoking jurisdiction has the burden to establish subject matter jurisdiction." *Smith v. Am. Pain & Wellness, PLLC*, 747 F. Supp. 3d 989, 996 (E.D. Tex. 2024) (citing *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)). "In examining a Rule 12(b)(1) motion, the district court is empowered to consider matters of fact which may be in dispute." *Ramming*, 281 F.3d at 161 (citation omitted).

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to move to dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." To survive a motion to dismiss, plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## III.

## ANALYSIS

The Government asserts four grounds for dismissal. First, that Ryan lacks constitutional standing because it has not alleged an injury in fact. Doc. 19, Br. Mot. Dismiss, 10-14. Second, that Ryan lacks prudential standing because its claims fall outside the zone of interest that the APA is intended to protect. *Id.* at 15-18.[4] Third, that this Court lacks jurisdiction because the Declaratory Judgment Act in 28 U.S.C. § 2201 ("DJA") bars this suit. *Id.* at 14-15. And fourth, that Ryan fails

---

[4] The Government argues that Ryan's claims are outside the zone of interests necessary to state a claim under the APA and improperly characterizes this argument as brought "on the merits." Doc. 19, Br. Mot. Dismiss, 15. But as discussed in more depth below, the "zone of interest" analysis is properly characterized as a standing inquiry.

to state a claim under the APA because the Final Rule was issued within the Treasury's authority, is not contrary to law, and is not arbitrary or capricious. *Id.* at 18-24.

Starting with the Government's first three arguments, which are jurisdictional challenges under Rule 12(b)(1), the Court finds that Ryan has both constitutional and prudential standing and that the DJA does not bar this suit. Thus, the Court has jurisdiction to hear Ryan's claims. Next addressing the Government's Rule 12(b)(6) challenge, the Court finds Ryan has properly alleged that the Final Rule is arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A). However, Ryan has not properly alleged violations of the APA in its first two claims, and the Court **DISMISSES** those claims with prejudice.

A.      *Ryan Has Standing to Challenge the Final Rule Under the APA*

     1.   <u>Constitutional Standing</u>

The Constitution of the United States limits the jurisdiction of federal courts to "Cases" and "Controversies." Art. III, § 2. As a sorting mechanism, separating out cases and controversies subject to judicial review from those that are not, courts invoke the doctrine of standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Standing is a requirement that the plaintiff filing suit "have a personal stake in the dispute." *FDA v. All. for Hip. Med.* ("*AHP I*"), 602 U.S. 367, 379 (2004) (internal quotation marks and citation omitted). To establish standing, a plaintiff must show (1) an "injury in fact," (2) a sufficient "causal connection between the injury and the conduct complained of," and (3) a likelihood that the injury "will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61 (citations omitted). Plaintiffs must clearly allege "facts demonstrating each element" of standing. *Spokeo, Inc. v. Robins,* 578 U.S. 330, 338 (2016) (citation modified). While a court's analysis of a motion to dismiss is generally confined "to the complaint and its proper attachments," *Hale v. King,*

642 F.3d 492, 498 (5th Cir. 2011), a court may, when resolving a Rule 12(b)(1) Motion, also consider properly admitted declarations. *See Texas v. Garland*, 719 F. Supp. 3d 521, 550 (N.D. Tex. 2024) (Hendrix, J.) (finding that Fifth Circuit precedent permits consideration of the "whole record" when resolving a 12(b)(1) motion, including "declarations and other evidence," in determining whether the plaintiff has standing) (citation omitted), *rev'd and vacated on other grounds sub nom. Texas v. Bondi*, 149 F.4th 529 (5th Cir. 2025); *see also Williamson v. Tucker*, 645 F.2d 404, 413-14 (5th Cir. 1981) (noting that a district court has broader power to decide "its own right to hear the case" in a 12(b)(1) motion than with factual 12(b)(6) motions on the merits). Without standing, this Court lacks subject-matter jurisdiction to hear the dispute. *See Ortiz v. Am. Airlines, Inc.*, 5 F.4th 622, 627 (5th Cir. 2021).

The Government argues that Ryan has not alleged an injury in fact or demonstrated a sufficient causal connection between the Final Rule and Ryan's purported injury. *See* Doc. 16, Mot. Dismiss, 10-14. To show an injury in fact, Ryan must show an injury that is (1) "concrete and particularized," and (2) "actual or imminent—not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks and citation omitted). To be particularized, "the injury must affect the plaintiff in a personal and individual way." *FDA v. All. for Hip. Med.* ("*AHP II*"), 602 U.S. 367, 381 (2024) (internal quotations and citation omitted). This "prevents the federal courts from becoming a vehicle for the vindication of the value interests of concerned bystanders." *Id.* at 382 (internal quotations and citation omitted). To be actual or imminent, the injury "must have already occurred or be likely to occur soon." *Id.* at 381. (citation omitted). To show a causal connection between the injury and the conduct complained of, the injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party

not before the court." *Lujan*, 504 U.S. at 560 (citation modified) (citing *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976).

Where the plaintiff "challenges the government's 'unlawful regulation (or lack of regulation) of *someone else*,' 'standing is not precluded, but it is ordinarily substantially more difficult to establish.'" *AHP II*, 602 U.S. at 382 (emphasis in original) (quoting *Lujan*, 504 U.S. at 562). But "[g]overnment regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements." *Id.*

Ryan makes few explicit references to its injury in its Amended Complaint. The sole facts alleging injury are that the Final Rule discourages Ryan's clients from hiring it to establish and manage captive insurance companies in the future and "prevent[s] Ryan from developing and expanding its business in the micro-captive sector." *See* Doc. 5, Am. Compl. ¶ 9. As a result, Ryan claims it would "lose revenue, profits, and goodwill." *Id.*

But Ryan also submits, with its Response to the Government's Motion, the Declaration of Kenneth Kotch, the national practice leader in charge of Ryan's captive insurance program, "in support of" Ryan's Response Brief. Doc. 21-1, Decl. Kotch ¶¶ 1, 4. In relevant part, the Kotch Declaration asserts facts—as it could have done directly in the Amended Complaint—that Ryan has actually advised clients on MCTs that the Final Rule defines as reportable and that Ryan, as of July 2025, was actively preparing to submit the requisite disclosures. *Id.* ¶¶ 13, 15, 19. Because the Court, in determining its own jurisdiction under a Rule 12(b)(1) analysis, may consider the whole record, the Court will consider the Kotch Declaration *for that limited purpose. See Garland*, 719 F. Supp. 3d at 550 (finding that Fifth Circuit precedent permits consideration of the "whole record" when resolving a 12(b)(1) motion, including "declarations and other evidence," in determining whether

the plaintiff has standing) (citation omitted); *see also Williamson*, 645 F.2d at 413-14.[5] Notably, "even if the declaration[] could not be considered, the proper course of action would be to allow [Ryan] leave to amend," at which point Ryan could "add the statements from the declaration[] to an amended complaint or . . . attach them." *Garland*, 719 F. Supp. 3d at 550. There is no justification for "requiring the [P]arties to jump through additional procedural hoops" only for the Parties to reargue this Motion in several months. *Id.*

As the party invoking federal jurisdiction, Ryan asserts two separate bases for alleged injuries in fact that were or will be caused by the Final Rule. First, Ryan claims that the facts alleged are sufficient to show that Ryan is directly regulated under the Final Rule as a "material advisor," and its increased regulatory obligations are a clear injury in fact. Doc. 21, Resp., 8. Second, Ryan claims that because the Final Rule "discourages current clients and potential clients from establishing and maintaining captive insurance companies," its business is directly impacted by the Final Rule's economic implications. *Id.* at 9.

To be a material advisor that is affected by the Final Rule, Ryan must have advised on or assisted with specific, reportable MCTs and derived sufficient gross income from those transactions. *See* 26 U.S.C. § 6111(b)(1) (identifying material advisors as provisioners of aid, assistance, or advice with respect to reportable transactions and establishing gross income thresholds for such aid, assistance, or advice); 26 C.F.R. § 301.6111-3(b) (implementing § 6111). Ryan alleges that it helps clients establish and maintain captive insurance companies, *see* Doc. 5, Am. Compl. ¶ 9, and in the

---

[5] The Government argues that the Kotch Declaration cannot "cure the defect in [Ryan's] pleadings." Doc. 24, Reply, 3. Both cases the Government relies on for this proposition are addressing declarations in the context of a 12(b)(6) claim, not 12(b)(1). Moreover, the Government does not actually challenge the substance of assertions made in the Kotch Declaration that Ryan is a material advisor. *See* Doc. 19, Mot. Dismiss, 12 n.15. Indeed, the Government acknowledges that this is likely the case. *See id.* As such, the Court exercises its substantial discretion to determine jurisdictional facts. *See Williamson*, 645 F.2d at 413.

Kotch Declaration, Ryan clarifies that some of those insurance companies were MCICs meeting criteria that trigger the Final Rule's reporting requirements. Doc. 21-1, Decl. Kotch ¶ 13. As such, the Final Rule actively *requires* Ryan to make disclosures to the IRS, which satisfies "both the injury in fact and causation requirements." *AHP II*, 602 U.S. at 382. Because the Court finds, based on the whole record, *see Garland*, 719 F. Supp. 3d at 550, Ryan has sufficiently alleged that it is a material advisor that is directly regulated by the Final Rule, it does not need to address Ryan's other asserted basis for injury in fact.

   2. <u>Prudential Standing</u>

  The Government argues that Ryan's claims are outside the zone of interests necessary to state a claim under the APA. Doc. 19, Br. Mot. Dismiss, 15. Properly understood, the "zone of interests" analysis is another inquiry into standing—and prudential standing in particular. *Encompass Off. Sols., Inc. v. Conn. Gen. Life Ins. Co.*, No. 3:11-CV-02487-L, 2012 WL 3030376, at *3 (N.D. Tex. July 25, 2012) (Lindsay, J.) (explaining that to establish standing, plaintiffs must satisfy both constitutional standing requirements, such as injury in fact, and prudential standing requirements, like the zone of interests analysis); *see Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970) (explaining that in considering standing, along with the case-or-controversy test, the court must consider whether the interests sought to be protected are "within the zone of interests to be protected or regulated by the statute" in question); *Am. Fed'n of Gov't Emps., AFL-CIO v. Stetson*, 640 F.2d 642, 646 (5th Cir. 1981) (discussing zone of interest as a requirement for standing).

  Courts presume that a statutory cause of action—such as Ryan's claims brought under the APA—extends "only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (internal

quotation marks and citation omitted). "[I]n the APA context . . . the test is not especially demanding." *Id.* at 130 (internal quotation marks and citation omitted). The benefit of any doubt goes to the plaintiff, and the test will foreclose suit only if the plaintiff's interests "are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Id.* (internal quotation marks and citation omitted).

Here, Ryan challenges the Final Rule—a reporting regulation that applies to taxpayers and their material advisors. *See* Doc. 5, Am. Compl. ¶ 1; Micro-Captive Transactions, 90 Fed. Reg. 3534. As already discussed in depth when considering constitutional standing, Ryan's interests are more than "marginally related" to the Final Rule's disclosure obligations, *Lexmark*, 572 U.S. at 130, because the record demonstrates that Ryan is, itself, required to report past MCTs under the Final Rule, *see* Doc. 21-1, Decl. Kotch ¶¶ 13, 15, 19.[6] As such, Ryan's claims are within the zone of interests necessary to state a claim under the APA.

B.    *The Declaratory Judgment Act does not Deprive this Court of Jurisdiction*

"If section 702 of the APA creates a cause of action for [a] claim, jurisdiction exists under the general federal question statute [28 U.S.C. § 1331]," and "[t]he APA then serves as the waiver of sovereign immunity that allows a private party to sue the government." *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 n.13 (5th Cir. 1998) (citations omitted). Moreover, APA claims may be brought using "any applicable form of legal action, including actions for declaratory judgments." 5 U.S.C. § 703. Section 702 creates a cause of action if the party claiming a right to sue (1) identifies

---

[6] Because this is another 12(b)(1) challenge to Ryan's standing, the Court again consults the whole record. *See Williamson*, 645 F.2d at 413.

"some [final] 'agency action' that affects [it] in the specified fashion" and (2) shows that it has "'suffer[ed] legal wrong' because of the challenged agency action, or is 'adversely affected or aggrieved' by that action." *Lujan v. Nat'l Wildlife Fed'n* ("*Lujan I*"), 497 U.S. 871, 882-83 (1990) (citations omitted). The rule at issue here is final, and Ryan, as discussed above, was adversely affected by the Final Rule as a material advisor. As such, the APA provides a valid cause of action.

Still, the Government claims that the APA does not waive sovereign immunity here because it is "expressly or impliedly" forbidden by another statute—the Declaratory Judgment Act ("DJA"). Doc. 24, Reply, 4 (internal quotation marks and citation omitted).

Under the DJA, "[i]n a case of actual controversy within its jurisdiction, *except with respect to Federal taxes* . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a) (emphasis added). The DJA "does not of itself confer jurisdiction on the federal courts." *Rivero v. Fid. Invs., Inc.*, 1 F.4th 340, 343 (5th Cir. 2021) (citation omitted). Instead, it enables federal courts to provide declaratory relief in cases where jurisdiction is already established, *see id.*, while expressly carving out cases "with respect to federal taxes." § 2201(a). As interpreted by the Fifth Circuit, the DJA does not just require denying declaratory relief in cases respecting federal taxes, it entirely divests federal courts of jurisdiction to entertain the claim for declaratory relief. *See Rivero*, 1 F.4th at 345 (citing *Warren v. United States*, 874 F.2d 280, 282 (5th Cir. 1989)).

The issue presented here is thus whether the DJA precludes Ryan's action, where Ryan challenges a Treasury regulation that imposes disclosure requirements and seeks among other things, declaratory relief. *See* Doc. 5, Am. Compl. ¶ 7. In other words, the Court must consider whether Ryan's action is "with respect to Federal taxes" such that the DJA divests jurisdiction. *See* § 2201(a).

Arguing that Ryan's action is so limited, the Government relies heavily on the Fifth Circuit's decision in *Rivero*.

In *Rivero*, an individual sought a declaratory judgment that she did not have to file an IRS transfer certificate to transfer ownership in her brokerage account, per certain tax code provisions. 1 F.4th at 343. The district court dismissed the complaint for lack of jurisdiction, finding that because the action required the court "to construe various tax code provisions and treasury regulations" it was precluded by the DJA's plain language. *Id.* (internal quotations and citation omitted). The Fifth Circuit agreed because even though the action did not involve the "assessment or collection of any tax," "deciding the *merits*" of the request for declaratory judgment "inevitably involve[d] sifting through . . . applicable Treasury regulations . . . in order, ultimately, to make a determination 'with respect to Federal taxes,' beyond the power granted to federal courts by the DJA." *Id.* at 345-46 (emphasis added). Indeed, the substantive issue before the court was *whether certain treasury regulations required* the plaintiff to provide a transfer certificate before she could access a brokerage account, which plainly required interpretation of federal tax laws. *Id.*

Ryan, in turn, relies on the Supreme Court's recent decision in *CIC Services, LLC v. IRS* ("*CIC I*"), 593 U.S. 209 (2021). There, the plaintiff, CIC, challenged the 2016 IRS Notice, which like the Final Rule at issue here, required taxpayers and their material advisors to report certain information about certain MCTs. *Id.* at 214-15. CIC requested both injunctive and APA-based relief, and the Supreme Court was thus tasked with determining whether CIC's action would be barred by the Anti-Injunction Act—a statute that prevents suits "for the purpose of restraining the assessment or collection of any tax." *Id.* at 212. The Supreme Court held that "[a] reporting penalty is not a tax"

and suits "brought to set aside such a rule" are not ones that "enjoin a tax's assessment or collection." *Id.* at 216.

While *CIC I* was applying the Anti-Injunction Act—not the DJA—the Supreme Court's characterization of CIC's suit is particularly relevant. The Supreme Court explained that it was not "a tax action in disguise" because (1) the IRS Notice imposed affirmative reporting obligations (inflicting costs separate and apart from any tax), (2) the reporting requirement was several steps removed from the tax penalty (it was hard to characterize the suit as enjoining a tax), and (3) the IRS Notice was punishable by both taxes and separate criminal penalties (such that relief from taxes was not the sole purpose of a prospective injunction). *Id.* at 220-22. These reasons showed that the action targeted the "upstream reporting mandate, not the downstream tax." *Id.* at 223.

Although the DJA's federal tax exception could apply to a suit brought under the APA to prohibit declaratory relief from a Treasury regulation, Ryan's suit is not "with respect to federal taxes" for purposes of the DJA. Unlike *Rivero*, here the Court is not tasked with "sifting through" tax code provisions and treasury regulations to make a decision *on the merits. See* 1 F.4th at 346. Ryan challenges the Final Rule's legality under the APA based on the manner in which it was promulgated. *See* Doc. 5, Am. Compl. ¶ 4. Neither party asks the Court to meaningfully construe any tax provision, or challenges the Final Rule's substantive application to Ryan or its clients beyond the bare standing inquiry above.[7] The Court is instead tasked with construing provisions of the APA and congressional statutes that formed the basis for the Treasury's *authority* to pass the Final Rule—tasks plainly beyond making "a determination with respect to Federal taxes." *See Rivero*, 1 F.4th at 346 (internal quotation

---

[7] And neither party actually disputes the application of those tax provisions. Even the Government admits that Ryan may be a material advisor and merely argues that Ryan failed to allege as much. *See* Doc. 19, Br. Mot. Dismiss, 12 n.15.

marks omitted). Moreover, while *CIC I* was not construing the DJA, it made clear that an APA claim (nearly identical to the one at issue here) is not "a tax action in disguise" when the suit is challenging upstream reporting obligations that inflict costs separate and apart from any tax and threaten criminal penalties. *See* 593 U.S. at 220-23. Ryan's suit is exactly that. Indeed, the Government makes little effort to distinguish the IRS Notice at issue in *CIC I* from the Final Rule here.

Like the plaintiff in *CIC I*, Ryan challenges the legality under the APA of the Final Rule's reporting requirements and is not merely seeking relief from its application or from a particular tax. *Compare Rivero*, 1 F.4th at 345-46 (considering the *application* of a Treasury regulation to the plaintiff), *with CIC I*, 593 U.S. at 219 (considering the *legality* of a treasury regulation under the APA, which the parties *agreed* would otherwise apply to the plaintiff). As such, the Court finds that the DJA does not preclude Ryan's APA suit from going forward.

The Government cites a litany of other cases, most out of circuit, which it claims show that the relief requested here falls "within the ambit of the DJA." Doc. 24, Reply, 5. None of those cases help the Government's argument. None of them involves challenges under the APA, many of them consider the application—not legality—of the Treasury regulations at issue, and some of them even imply that the Anti-Injunction Act and the DJA have coterminous application, which would only make *CIC I*'s analogous application here stronger. *See, e.g., McCarthy v. Marshall*, 723 F.2d 1034, 1037 (1st Cir. 1983).

The Court is likewise not persuaded by the Government's contention that this is just an action for a declaratory judgment dressed up as an APA claim. Doc. 24, Reply, 1. Ryan asserts three causes of action here: (1) whether in promulgating the Final Rule, the Treasury exceeded its statutory authority in violation of § 706(2)(C); (2) whether in promulgating the Final Rule, the Treasury acted

contrary to law in violation of § 706(2)(A); and (3) whether the Final Rule is arbitrary and capricious, in violation of § 706(2)(A). *See* Doc. 5, Am. Compl. ¶¶ 39-53. Each of these claims arises under the APA, and the Government cites no basis for this Court to treat them as anything else. Moreover, in *CIC I*, while CIC's principal claim was that the IRS Notice was arbitrary and capricious under the APA, CIC also requested that the district court declare that notice unlawful. *See* 593 U.S. at 214-15. At no point did the Supreme Court indicate that the action, while seeking declaratory relief, was anything other than a claim brought under the APA. *See generally id.*

Finally, the Court is not persuaded by the Government's argument that the DJA's federal tax exception is broader in scope than the Anti-Injunction Act's bar on suits that obstruct the collection of taxes. *See* Doc. 24, Reply, 8-9. Most courts to compare the two acts have held that they are coterminous. *Bob Jones Univ. v. Simon*, 416 U.S. 725, 732 n.7 (1974) (collecting cases); *Cohen v. United States*, 650 F.3d 717, 727 (D.C. Cir. 2011) (en banc) (same); *cf. Warren v. United States*, 874 F.2d 280, 282 (5th Cir. 1989) (interpreting the statutes together because "the federal tax exception to the Declaratory Judgment Act is at least as broad as the Anti-Injunction Act") (citation omitted). *Rivero* holds—or at least implies—that in the Fifth Circuit the DJA's federal tax exception is broader than the Anti-Injunction Act (thus not coterminous) because the DJA's exception is not limited to claims about a tax's assessment or collection. 1 F.4th at 345-46. However, to the extent that the DJA exception's scope is broader under *Rivero*, the exception extends only to cases that require the court to "sift through" tax codes and treasury regulations to make its determination on the merits. *See id.* This Court takes that limited extension into account in the above analysis and notes again that it need not engage in that type of substantive tax-law inquiry to resolve this case. Because Ryan's suit is not "with respect to federal taxes," the DJA does not divest the Court of jurisdiction.

C.    *Ryan's First and Second APA Claims Should be Dismissed for Failure to State a Claim, While Ryan's Third Claim Properly States a Violation.*

Turning to the merits, Ryan asserts three causes of action here: (1) whether in promulgating the Final Rule, the Treasury exceeded its statutory authority in violation of § 706(2)(C); (2) whether in promulgating the Final Rule, the Treasury acted contrary to law in violation of § 706(2)(A); and (3) whether the Final Rule is arbitrary and capricious in violation of § 706(2)(A). *See* Doc. 5, Am. Compl. ¶¶ 39-53. The Court addresses each in turn and finds that Ryan fails to state claims for relief as to its first and second claims. However, Ryan adequately alleges that the Final Rule was arbitrary and capricious in violation of § 706(2)(A).

1.    Ryan Fails to Allege that the Treasury Exceeded its Statutory Authority in Promulgating the Final Rule

A reviewing court shall "hold unlawful or set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." § 706(a)(2)(C). "Administrative agencies must ground their actions in a valid grant of authority from Congress." *Midship Pipeline Co., L.L.C. v. FERC*, 45 F.4th 867, 876 (5th Cir. 2022) (citation modified). "To determine 'the authority that Congress has provided,' we examine an agency's authorizing statutes." *Id.* (citing *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor, Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022)). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). "And when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it." *Id.* at 413.

Congress delegated significant authority to the Treasury to identify transactions with a risk of tax avoidance. The Unites States Code defines reportable transactions as "any transaction with

respect to which information is required to be included with a return or statement because, *as determined under regulations prescribed under section 6011*, such transaction is of a type which the *Secretary [of the Treasury] determines* as having a potential for tax avoidance or evasion." 26 U.S.C. § 6707A(c)(1) (emphases added). Listed transactions are similarly defined as "reportable transaction[s] which [are] the same as, or substantially similar to, a transaction specifically identified by the Secretary [of the Treasury] as a tax avoidance transaction for the purposes of section 6011." § 6707A(c)(2). The Treasury has accordingly prescribed implementing regulations under § 6011, which require the disclosure of participation in reportable transactions, including listed transactions that are "identified by notice, regulation, or other form of published guidance." *See* 26 C.F.R. § 1.6011-4(b)(2). In sum, Congress empowers the Treasury (and thereby the IRS) to, through its own regulations and guidance, define the kind of transactions that must be reported due to their potential for tax avoidance or evasion.

Ryan's argument[8] that the Final Rule was implemented in excess of statutory authority is difficult to place. Ryan does not actually allege that the Treasury acted beyond the statute it invokes to promulgate the Final Rule. Instead, Ryan argues that the Final Rule contains "overbroad criteria" that will erroneously treat legitimate MCICs as "presumptively or potentially illegitimate tax-avoidance schemes" despite Congress's implicit approval of MCICs when Congress implemented and later updated § 831(b). Doc. 5, Am. Compl. ¶ 41; Doc. 21, Resp., 16-17. This, Ryan asserts, means the Final Rule imposes "a test that Congress never authorized" as to MCICs, and thereby undermines the will of Congress. *Id.* at 16. As an example, Ryan notes that an MCIC that entirely

---

[8] Ryan, in its Response Brief opposing dismissal, combines its arguments that the Treasury acted in excess of statutory authority with its arguments that the Treasury acted contrary to law in a single section. Doc. 21, Resp., 15-18. The Court therefore applies each identifiable argument in that section—to the extent applicable—to each of Ryan's first two claims.

qualifies for the tax preference under § 831(b) is not relieved from the Final Rule's disclosure obligations. *Id.* at 17.

But this argument fails to show that the Treasury acted outside the authority granted to it by Congress. The Final Rule was implemented pursuant the Treasury's mandate to identify transactions with a risk of tax avoidance. *See* § 6707A(c). The Treasury, via the IRS, is also tasked with determining which transactions carry such a risk. *See id.*; 26 C.F.R. 1.6011-4(b)(2), (6) (designating IRS as bureau responsible for determining whether a transaction is or is suspected to be for tax avoidance). Ryan does not claim that the Treasury misconstrued Congress's delegation in § 6707A. Ryan instead claims that Congress's implicit, general approval of MCICs in an entirely separate statute—§ 831(b)—means the Treasury exceeded its authority in imposing disclosure obligations over a subset of MCICs.[9] But "when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation." *Loper Bright*, 603 U.S. at 413. As Ryan neither claims the Treasury exercised authority not provided by § 6707A nor challenges the delegation itself, the Court is bound to respect that delegation.

Ryan further argues that the Treasury cannot make something a "reportable transaction" if it does not first determine that the transaction in question has the potential for tax avoidance or evasion. *Id.* at 18 (implying that the Treasury did not first make that determination here). A brief examination of the Final Rule suggests that the Treasury did in fact determine that MCICs have a

---

[9] It is hard to see any limiting principle to this argument. It is not unlike a claim that, because Congress allows for the formation of "S Corporations" and grants them pass-through taxation status if they meet certain criteria under 26 U.S.C. § 1361, any Treasury regulation that imposes listed transaction disclosure obligations on some qualifying S Corporations, *see, e.g.*, I.R.S. Notice 2004-30, is automatically in excess of the Treasury's constitutional authority because it "undermines" Congress's approval of S Corporations generally. Under Ryan's approach, any regulation would be "in excess of authority" if imposed on an activity or entity receiving general Congressional approval, regardless of whether the regulation is authorized by Congress.

potential for tax avoidance. The Final Rule states twice that "[t]he IRS is confident from its review of examinations and case law that the fact pattern described in the regulations is a fact pattern that consistently gives rise to tax avoidance or otherwise potentially gives rise to tax avoidance." *See* Micro-Captive Transactions, 90 Fed. Reg. at 3555. Thus, this argument likewise fails to show that the Treasury acted outside the authority granted it under § 6707A(c). Questions over the adequacy of the Treasury's determinations (via the IRS) are more properly considered under Ryan's third claim that those determinations were arbitrary and capricious.

Because Ryan fails to state a claim that the Treasury acted in excess of statutory authority in promulgating the Final Rule, Ryan's first cause of action is **DISMISSED with prejudice**.

> 2. <u>Ryan Fails to Allege that the Treasury Acted Contrary to Law in Promulgating the Final Rule</u>

A reviewing court shall "hold unlawful or set aside agency action . . . found to be . . . not in accordance with law." § 706(a)(2)(A). This includes "*any* law, and not merely those laws that the agency itself is charged with administering." *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (emphasis in original).

Ryan, in claiming that the Final Rule is not in accordance with law, refers generally to Congress's "clearly demonstrated intent to ensure the continued availability of captive insurance programs" as manifested in § 831(b) as modified by the PATH Act. Doc. 5, Am. Compl. ¶¶ 43-46; *see* Doc. 21, Resp., 16. However, the Final Rule is a reporting requirement. It does not preclude captive insurance companies—and MCICs in particular—from existing or obtaining preferential tax treatment; it merely sets disclosure obligations for transactions involving a subset of those entities. *See* Micro Captive Transactions, 90 Fed. Reg. at 3534. While § 831(b) and the PATH Act show Congress's general intent for such entities to exist and obtain tax relief, Ryan asks the Court to find

that Congress's specific intent is for all MCICs to exist free of any "substantial reporting obligations." Doc. 21, Resp., 18. Ryan assumes too much. Indeed, when Congress amended § 831(b) through the PATH Act in 2015, the Treasury was already tasked with identifying reportable and listed transactions under § 6707A(c). Section 831(b) does not expressly curtail the Treasury's role in the context of MCTs, so the Court will not assume an unstated congressional intent to do so. *Cf. Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 185 (1994) ("[I]t is not plausible to interpret . . . statutory silence as tantamount to an implicit congressional intent.").

Because Ryan fails to state a claim that the Treasury acted contrary to law in promulgating the Final Rule, Ryan's second cause of action is **DISMISSED with prejudice**.

### 3. Ryan Properly States its Claim that the Final Rule is Arbitrary and Capricious

As a threshold matter, Ryan argues that the Court cannot consider dismissal of its third claim at this stage because the Government has not produced the full administrative record. Doc. 21, Resp., 19-21. While the Court agrees that it cannot decide Ryan's arbitrary and capricious claim *on the merits* without the complete record,[10] Ryan's Complaint is still subject to Rule 8(a)'s pleading requirements. *Compare* § 706 (requiring courts to "review the whole record or those parts of it cited by a party" in resolving 706(2)(A) claims), *with* FED. R. CIV. P. 8(a)(2) (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief"), *and Bell Atl.*, 550 U.S. at 570 (holding that under Rule 8, plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face"). Accordingly, while the Court takes no position on whether the administrative record would provide a basis for a different outcome on the merits, the Court considers below whether Ryan has sufficiently *pleaded* that the Final Rule is arbitrary and capricious.

---

[10] *See Farrell v. Tillerson*, 315 F. Supp. 3d 47, 69 (D.D.C. 2018) (collecting cases).

-24-

The APA directs that courts may "set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." § 706(2)(A). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project,* 592 U.S. 414, 423 (2021). When reviewing an arbitrary-and-capricious claim, courts consider whether an agency "articulate[d] a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). While courts are precluded from "supply[ing] a reasoned basis for the agency's action," they can "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* (citations omitted).

Ryan claims that the Final Rule is arbitrary and capricious because the Treasury "made no effort to explain why the relevant facts and data support[] its belief that captive insurance companies present particular potential for tax avoidance or evasion" or to explain why the criteria chosen—specifically the loss ratios and Owner-Financing Factor—effectively distinguish abusive transactions from permissible transactions. Doc. 5, Am. Compl. ¶¶ 48-53; Doc. 21, Resp., 21-25. The Court will address these issues separately.

The Final Rule presumes that MCTs are or have the potential for tax avoidance or evasion. Per the Final Rule's preamble, this "reflects the IRS's long-standing positions with respect to abusive micro-captives as made public in annual Dirty Dozen tax schemes publications and case law." 90 Fed. Reg. at 3538. Ryan argues this assumption is arbitrary and capricious because none of that information "has been produced" or properly lays out the IRS's basis for this position. Doc. 21, Resp., 21. Indeed, the IRS Notice was similarly found to be arbitrary and capricious where the IRS pointed to the same "Dirty Dozen" publications, two IRS news releases, and compiled cases generally

involving captive insurance companies for its belief that "micro-captive transactions" had the "potential for tax avoidance or evasion." *See CIC II*, 592 F. Supp. 3d at 685-87. There, the district court noted that these summaries lacked "underlying facts or data" to show that the IRS was aware of a large number of problematic transactions or that those transactions actually "ha[d] the potential for tax avoidance or evasion." *Id.* at 686. The same deficiencies are present in the Final Rule. While the Final Rule's preamble dedicates significant discussion to the Final Rule's criteria, it only summarily addresses the basis for the Treasury's scrutiny of MCTs in the first place. Ryan plausibly alleges that, with such summary treatment, the Treasury failed to "reasonably explain[]," *Prometheus*, 592 U.S. at 423, or articulate a "satisfactory explanation," *State Farm*, 463 U.S. at 43, for the Final Rule's targeting of MCTs.

Ryan also plausibly alleges that the Treasury lacks a basis for the Final Rule's loss-ratios criteria. Under the Final Rule, a loss ratio of less than 60% classifies MCTs as "transactions of interest," *see* § 1.6011-11(c)(2), while a loss ratio of less than 30% may result in classification of MCTs as "listed transactions," *see* § 1.6011-10(c)(1)-(2).

The 60% threshold is based on national averages for non-life insurance companies subject to tax under § 831, including *but not limited to* MCICs. 90 Fed. Reg. at 3542. Specifically, the Treasury considered average property and casualty loss ratios for commercial insurers as provided by the "annual NAIC [National Association of Insurance Commissioners] Report on Profitability by Line by State for each year from 2013 through 2022." *Id.* After removing certain business lines that captive insurance companies typically do not or cannot cover, the Treasury ended up with an "average modified loss ratio factor of 67%." *Id.* Accordingly, the Treasury settled on a 65% loss ratio factor in the Proposed Rule. *Id.* However, when commenters argued that this was still too high or

that loss ratios were improper indicia to identify abusive MCTs, the Treasury lowered the ratio to 60% for the Final Rule. *Id.* In response to concerns that the NAIC Report, which covered only commercial insurers, was an inappropriate benchmark to capture data on captive insurers, the Treasury simply noted that commenters failed to "identify any alternative published data set . . . nor is the IRS aware of one" that would have provided a more accurate ratio. *Id.*

MCICs only pay out for major, infrequent events. Doc. 5, Am. Compl. ¶¶ 30-31. Accordingly, they need to accrue substantial reserves over years without losses and are likely to have low loss ratios as a result of regular operations. Indeed, the Treasury was aware of this when they determined that all MCTs with a loss ratio of 60% or less would be reportable transactions of interest. *See* 90 Fed. Reg. at 3541 (acknowledging that "low loss ratios [for MCICs] may be the result of coverage of low-frequency, high severity risks"). This was a key issue raised by the commenters. *See id.* at 3542. Ryan alleges that despite these concerns, the Treasury's response was to merely reduce the loss ratio for transactions of interest from 65% to 60%. *Id.* And on the limited record presented, the Treasury fails entirely to explain why—despite acknowledged issues with both the NAIC dataset and the low-loss-ratio nature of MCICs—even a 60% loss ratio would be the proper metric to meaningfully detect fraudulent MCTs. *See id.* Thus, Ryan plausibly alleges that the Treasury did not articulate a "satisfactory explanation for its actions" and that the Final Rule's loss ratio for transactions of interest is arbitrary and capricious. *State Farm*, 463 U.S. at 43.

Ryan alleges that the Final Rule's 30% loss ratio for listed transactions has a similar flaw. According to the Final Rule's preamble, the Treasury settled on 30% after consideration of the Tax Court's holding in *R.V.I. Guar. Co., Ltd. & Subs. v. C.I.R.*, 145 T.C. 209 (2015). 90 Fed. Reg. at 3541. The Treasury noted that in *R.V.I.*, the insurance company at issue had a loss ratio that varied

significantly year over year from a low of 0.2% to a high of 97.9%, while the average ten-year loss ratio in that period was 32%. *Id.* (citing *R.V.I.*, 145 T.C. at 216). Thus, according to the Treasury, 30% was a reasonable loss ratio. *Id.* Under the Final Rule, when a 30% loss ratio is coupled with the Owner-Financing Factor, the transaction in question is a reportable listed transaction. § 1.6011-10(c)(1)-(2).

Ryan argues that the Treasury's reliance on a single case—*R.V.I.*—to select the 30% loss ratio is insufficient and misplaced. In *R.V.I.*, where the Tax Court found that the insurance company at issue was *not* a tax avoidance scheme, the insurance company's loss ratio was below 30% in nine of the fourteen years on record. 145 T.C. at 216 (reflecting a ratio of over 50% only twice). It was at or below 1% in four of those years, and the company's average ten-year loss ratio would have been well below 30% if not for a single year where the loss ratio was 97%. *See id.* Thus, *R.V.I.* shows that even a genuine insurance company may in most years have a loss ratio well under the limit that the Treasury chose to classify as indicative of fraud. *See id.* Accordingly, Ryan plausibly alleges that in selecting the 30% loss ratio, the Treasury did not draw a "rational connection between the facts found and the choice made" and the Final Rule is arbitrary and capricious. *State Farm*, 463 U.S. at 43.

Because Ryan has sufficiently pled that the Final Rule is arbitrary and capricious, Ryan asserts a valid claim under § 706(2)(A). The Government's Motion to Dismiss is **DENIED** as to Ryan's third cause of action.

IV.

CONCLUSION

In sum, the Government's motion to dismiss is **GRANTED in part**. Ryan has standing to bring suit, this Court has jurisdiction to hear Ryan's APA claims, and Ryan properly pleads that the Final Rule is arbitrary and capricious. However, Ryan fails to state a claim that the Final Rule was enacted in excess of statutory authority or is contrary to law. Accordingly, the Court dismisses Ryan's first and second causes of action **WITH PREJUDICE**.


SO ORDERED.

SIGNED: November 5, 2025.

JANE J. BOYLE
SENIOR UNITED STATES DISTRICT JUDGE