UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RYAN, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:25-CV-0078-B |
| | § | |
| INTERNAL REVENUE SERVICE; the Hon. | § | |
| DANNY WERFEL, Commissioner of the | § | |
| Internal Revenue Service, in his official | § | |
| capacity, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are two motions for summary judgment. Plaintiff Ryan, LLC's Motion (Doc. 60) asks the Court to vacate certain regulations issued by the United States Department of the Treasury in 2025. The Government's[1] Response and Cross-Motion (Doc. 62) asks the Court to uphold those regulations. Having reviewed the briefing and applicable law, the Court **GRANTS** the Government's Motion in part and **DENIES** Ryan's Motion. A final judgment will follow.

---

[1] When a party files suit against the Internal Revenue Service ("IRS") or its commissioner in his or her official capacity, the United States is the real party in interest. *See, e.g.*, *Esparza v. IRS*, No. 6:19-CV-018-C, 2019 WL 13199739, at *1 n.2 (N.D. Tex. Oct. 8, 2019) (Cummings, S.J.) (noting that the United States was substituted in as the only defendant in a case brought against the IRS and its commissioner); *Edomwande v. IRS*, No. 3:09-CV-1573-K, 2009 WL 7171940, at *1 (N.D. Tex. Dec. 17, 2009) (Sanderson, Jr., Mag. J.) (substituting in the United States as "the real party in interest in cases involving the IRS" (citations omitted)), *report and recommendation adopted*, No. 3:09-CV-1573-K, 2010 WL 92295 (N.D. Tex. Jan. 6, 2010) (Kinkeade, J.); *Connor v. Matthews*, 134 F. Supp. 2d 797, 799 (N.D. Tex. 2001) (Kendall, J.) ("[S]uits brought against IRS employees in their official capacities are treated as suits against the United States." (citations omitted)); *cf. Hawaii v. Gordon*, 373 U.S. 57, 58 (1963) (per curiam) (finding that a suit against the Director of the Bureau of the Budget was in fact a suit against the United States).

# I.

# BACKGROUND

Ryan, a global tax consulting firm, challenges Treasury regulations that require taxpayers and their advisors to disclose certain transactions involving "micro-captive insurance companies" to the IRS. *See* Micro-Captive Listed Transactions and Micro-Captive Transactions of Interest, 90 Fed. Reg. 3,534 (Jan. 14, 2025) (codified at Treas. Reg. §§ 1.6011-10, -11) (hereinafter referred to as the "Final Rule"). For ease of explanation, the Court here provides background on captive insurance companies ("captives") generally, micro-captive insurance companies, the relevant statutory schemes, past efforts to regulate captives, and the Final Rule.

A.    *Captive Insurance Companies and 26 U.S.C. § 831*

A captive is a specialized insurance company owned and controlled by the same entities that it insures. Properly utilized, captives provide insurance coverage for infrequent but catastrophic risks; coverage that is either unavailable through commercial insurance or available but extraordinarily expensive. This includes coverage for uncommon events such as pandemics, hazardous waste accidents, or terrorism. *See* Doc. 38-1, Admin. R., at 4,302-03; Doc. 39, Admin. R., at 4,885. Unlike a traditional profit-oriented insurer, captives can charge lower premiums because they do not incur sales, marketing, and other profit-driven expenses. *See* Doc. 52-2, Admin. R., at 21,914. Also advantageous, a captive's claim processing is faster and less adversarial than in commercial insurance. *See id.* at 21,916. Given these benefits, many businesses, including Fortune 500 companies, use captive insurance to satisfy some of their insurance needs. *See id.* at 22,100.

Like most insurance arrangements, captives are creatures of state or foreign law; federal law does not govern their formation. However, federal law—the Internal Revenue Code in particular— does govern how the federal government taxes insurance companies and treats insurance-related

expenses. For instance, 26 U.S.C. § 831(a) imposes a tax on the income of all non-life insurance companies, without regard to the source. And 26 U.S.C. § 162(a) allows businesses to deduct payments made under their insurance policies (insurance premiums) from their income as ordinary and necessary business expenses. *See* Treas. Reg. § 1.162-1(a).

Given the complexity and start-up expenses associated with captive insurance, small companies historically did not use them—that is, until the enactment of § 831(b). In 1986, Congress amended § 831 to allow eligible insurance companies (including but not limited to captives) to be taxed only on their investment income and not on their underwriting income (the net amount of money received as premiums that is not paid out in insurance claims). *See* § 831(b)(1); An Act to Reform the Internal Revenue Laws of the United States, Pub. L. No. 99-514, Title X, § 1024(a)(4) (Oct. 22, 1986) (adding original § 831(b) alternative tax provision).

In its current form, § 831(b) permits non-life insurance companies with underwriting income not exceeding $2.2 million to elect this alternative tax structure, and thereby avoid federal taxes on their underwriting income, in two situations. The first is if "no more than 20 percent of the [insurance company's] net written premiums" is "attributable to any one policyholder." *See* § 831(b)(2)(B)(i)(I). The second is if no person owns interest in the insurance company that is materially larger than their interest in the assets being insured. *See* § 831(b)(2)(B)(i)(II). In effect, this second prong allows "closely held" captives, with a single policyholder and owner, to access § 831(b)'s favorable tax structure. *See id.*

B.      *Micro-Captive Insurance Companies and Their Uses (Legitimate and Illegitimate)*

Captives that qualify for § 831(b)'s alternative tax structure are known as "micro-captives." In effect, a qualifying micro-captive arrangement enables a parent company and its micro-captive to

not pay taxes on both ends of a money transfer: the parent company deducts from its income the insurance premiums paid to its micro-captive, and the micro-captive deducts from its income the net premiums received. This structure presents significant opportunities for tax deferral or elimination—both legitimate and illegitimate.

On one hand, these tax preferences enable small companies to offset the costs of creating and running captives. *See* Doc. 61, Ryan's Br., 4. Used properly, captives provide businesses with legitimate, flexible insurance; these tax preferences help small businesses access those same benefits with micro-captives.

But on the other hand, these tax preferences present hypothetical, and some proven,[2] opportunities for abuse. First, a business seeking to build loss reserves could transfer funds to its captive under the guise of insurance but without any actual risk transfer—thereby treating micro-captives more like tax-deductible savings accounts. *See* Doc. 63, Gov.'s Br., 6. Second, captive insurers sometimes lend money back to their insureds. When doing so, the insured business would not pay taxes on premiums paid to the micro-captive, the micro-captive would not pay taxes on the premiums received under § 831(b), and then the insured business would get its money back for use as a loan from the micro-captive. *See id.* This could enable opportunistic businesses to realize a tax loss without also suffering the same economic loss. *See id.* This is particularly problematic with closely held micro-captives, which have additional opportunity and incentive to administer the insurance in a manner inconsistent with an "arm's length" transaction. *See id.* at 7.

---

[2] Several cases are available in the administrative record where the United States Tax Court found that micro-captives were not offering true insurance. Those cases are identified and discussed below.

C.      *IRS's Scrutiny of Micro-Captives and Early Regulatory Failures*

By statute, Congress requires taxpayers to "make a return or statement according to the forms and regulations prescribed by" the Treasury. *See* 26 U.S.C. § 6011(a). Taxpayers and their material advisors (individuals and entities that assist taxpayers with certain transactions) who fail to disclose certain "reportable transaction[s]" as defined by the IRS are penalized. *See* 26 U.S.C. §§ 6707A(a), 6707A(c)(1), 6111(a)-(b), 6707(a). There are various forms of reportable transactions. The two forms at issue in this case are "listed transactions" and "transactions of interest" ("TOIs"). *See* Treas. Reg. § 1.6011-4(b)(2), (b)(6).

Regardless of the form at issue, a transaction is reportable only if it "is of a type" that the Treasury, acting through the IRS, "determines as having a potential for tax avoidance or evasion." § 6707A(c)(1). TOIs are a "catch-all" form of reportable transaction, for any type of transaction the IRS "believes . . . has the potential for tax avoidance or evasion." *Drake Plastics Ltd. v. IRS*, __ F. Supp. 3d __, __, 2026 WL 1021379, at *4 (S.D. Tex. Apr. 15, 2026) (citations omitted). Listed transactions, on the other hand, are defined more narrowly as the "same as, or substantially similar to, a transaction specifically identified by the Secretary as a tax avoidance transaction for purposes of section 6011." § 6707A(c)(2); *see* § 1.6011-4(b)(2) (emphasis added). But these designations do not affect the ultimate "legal determination of whether the taxpayer's treatment of the transaction is proper." § 1.6011-4(a). They are solely disclosure requirements.

In 2016, the IRS was concerned that bad actors were using micro-captives for tax avoidance. Acting on that concern, it published I.R.S. Notice 2016-66, 2016-47 I.R.B. 745 (the "IRS Notice"). The IRS Notice informed taxpayers and material advisors that, moving forward, the IRS would identify certain transactions involving micro-captives as TOIs, which would need to be reported on

tax forms. Under that reporting regime, taxpayers and their advisors submitted over 100,000 disclosures to the IRS to report micro-captive TOIs. *See* Doc. 49-1, Admin. R. 39, at 13,850.

In 2022, a federal district court in the Eastern District of Tennessee set aside the IRS Notice. *See CIC Servs., LLC v. IRS* (*CIC Servs. II*), 592 F. Supp. 3d 677, 687 (E.D. Tenn. 2022), *modified*, No. 3:17-CV-110, 2022 WL 2078036 (E.D. Tenn. June 2, 2022). The court did so on two grounds: First, the IRS Notice was invalid because the IRS failed to observe notice-and-comment procedures required by the Administrative Procedure Act ("APA"). *Id.* at 683. And second, the IRS Notice was arbitrary and capricious (also a violation of the APA) because the administrative record lacked facts and data showing that micro-captive arrangements had a potential for tax avoidance or evasion. *Id.* at 687. On this second point, the court explained that the IRS's "aware[ness]" and "belie[f]" that micro-captive transactions have the potential for tax avoidance was an insufficient basis for the notice—the IRS needed to, but did not, identify "facts or data" to support its belief. *See id.* at 685.

D.    *The Proposed Rule and Notice-and-Comment Period*

1.    The Proposed Rule's Structure

A year after the court's decision in *CIC Services II*, the Treasury began a formal notice-and-comment process to replace the IRS Notice with a new regulatory framework. The Treasury issued a proposed rule in April 2023, titled Micro-Captive Listed Transactions and Micro-Captive Transactions of Interest, 88 Fed. Reg. 21,547 (proposed Apr. 11, 2023) (the "Proposed Rule"). The Proposed Rule had two main provisions that set forth criteria by which the Treasury proposed to classify certain micro-captive transactions as TOIs or listed transactions. *See id.*

Both provisions use "loss ratios" as a key criterion. An insurance company's loss ratio is a ratio of losses paid out divided by premiums received in a given year. The formula is simple. If an

insurer pays out $50,000 in claims and receives $100,000 in premiums in a given year, its loss ratio is 50%.

Under the Proposed Rule, TOIs would include any transaction involving a micro-captive that had a loss ratio under 65% over the most-recent nine taxable years (or its lifetime if less than nine years). *Id.* at 21,556. Listed transactions would include any transaction involving a micro-captive that either (A) had a loss ratio below 65% over the most-recent ten taxable years or (B) made loans to a related party in the most-recent five taxable years. *Id.* at 21,555-56. Either form of reporting obligation would only apply to certain closely held micro-captives with an owner, insured, or related person holding over 20% of their assets, voting power, or value. *See id.* at 21,561-63.

## 2. Relevant Issues Raised in Comment Period

The Treasury sought and received significant comments on the Proposed Rule—many of which were critical. And Ryan was actively engaged in that criticism. Invoking the IRS Notice and its demise, Ryan questioned why the Treasury suspected micro-captives. *See* Doc. 5-2, Ryan LLC Comments, 4-6. Ryan also took particular issue with the Proposed Rule's 65% loss-ratio thresholds, commenting that loss ratios (and especially high loss ratios), were a poor metric for identifying abusive transactions because legitimate captives typically covered infrequent but catastrophic risks and thus inevitably have low loss ratios in most years. *See id.* at 10-11. Ryan suggested that captives offering genuine insurance may collect premiums for years before paying out any significant claims. *See id.*; *see also* 90 Fed. Reg. at 3,540 (noting that other commenters made same argument).

Other commenters pointed to recent Tax Court cases involving abusive micro-captives, where the micro-captives' loss ratios were much lower than the proposed 65%. *See id.* at 3,541. Some contended that the loss-ratio dataset relied upon by the Treasury for the 65% figure (data from the

National Association of Insurance Commissioners ("NAIC")) was an inappropriate benchmark for micro-captives because the NAIC's dataset included only commercial insurers, did not include data from captives, and included business lines that captives would not normally cover. *See id.* at 3,542.

Still other commenters questioned the suitability of related-party financing as a criterion to identify abusive transactions. *See id.* at 3,545. They doubted whether related-party financing could indicate that a transaction was abusive without any inquiry into the transaction's specific circumstances—like if the financing was on reasonable terms or was the product of arm's length negotiations. *See id.* One commenter noted the dearth of precedent or Internal Revenue Code provisions treating related-party financing as tax avoidant or abusive. *See id.* And because state regulators already review transactions involving related-party financing, the commenters contended that additional IRS scrutiny would be unnecessary or redundant. *See id.*

Finally, some commenters expressed concerns with the Treasury's decision to target only closely held micro-captives—those with policyholders that directly or indirectly own over 20% of the micro-captive's assets or voting power. *See id.* at 3,554. They claimed that Congress, by allowing closely held captives to access § 831(b)'s preferential tax structure under § 831(b)(2)(B)(i)(II), implicitly endorsed closely held micro-captives as being legitimate transactions. *See id.*

E.      *The Final Rule*

The Treasury published the Final Rule in January 2025. *See generally* 90 Fed. Reg. 3,534. The Final Rule maintains the Proposed Rule's general structure with a listed transaction provision and a separate TOI provision. But the Treasury did make several modifications.

Under the Final Rule's listed transaction provision, a transaction must be reported as a listed transaction if it involved a micro-captive that (1) had a loss ratio below 30% over the most-recent ten

taxable years *and* (2) provided financing to an owner, insured, or related person in the most-recent five taxable years. Treas. Reg. § 1.6011-10(c). Because the listed-transaction loss-ratio computation period is ten years, a micro-captive existing less than ten years cannot be a listed transaction. *See* § 1.6011-10(b)(2)(ii). In sum, the Treasury altered the Proposed Rule's listed transaction criteria by reducing the loss-ratio factor from 65% to 30% and creating a conjunctive test: a transaction is not a listed transaction unless it triggers both the loss-ratio and financing factors.

Under the Final Rule's TOI provision, a transaction is a TOI if it involves a micro-captive that has a loss ratio below 60% over the most-recent ten taxable years (or lifetime if less than ten years) or (2) provided financing to an owner, insured, or related person in the most-recent five taxable years. Treas. Reg. § 1.6011-11(b)(2), (c). In sum, the Treasury altered the Proposed Rule's TOI criteria by reducing the loss-ratio factor from 65% to 60% and by adding an alternative (not conjunctive) related-party financing criterion.

Both provisions only apply to micro-captives that are "closely held," with "at least 20 percent of the entity's assets," voting power, or value directly or indirectly owned by an owner, insured, or related person (qualifying micro-captives hereinafter referred to as "closely held" micro-captives). *See* § 1.6011-10(b)(1)(iii); § 1.6011-11(b)(1).

By the Treasury's and IRS's estimates, the reporting obligation itself would be minimal. 90 Fed. Reg. at 3,558. Specifically, the Treasury anticipates affected taxpayers to "incur costs of approximately $1,581.05 per filing." *Id.*

F.      *The Present Action*

Ryan first challenged the Final Rule on January 10, 2025—several days before its publication. *See generally* Doc. 1, Compl. Ryan filed its First Amended Complaint shortly thereafter. *See generally*

Doc. 5, Am. Compl. The Government moved to dismiss Ryan's Amended Complaint in April 2025. *See generally* Doc. 18, Mot. Dismiss. The Court granted in part the Government's motion and dismissed Ryan's first two causes of action. *See* Doc. 29, Mem. Op. & Order, 29. Now both parties move for summary judgment on Ryan's remaining claim—that the Final Rule's two provisions violate the APA and should be set aside because they are arbitrary and capricious.

On April 15, 2026, before this Court ruled on the parties' summary judgment motions, a federal district court in the Southern District of Texas vacated and set aside § 1.6011-10 (the section classifying micro-captive listed transactions). *Drake Plastics*, 2026 WL 1021379, at *1 (S.D. Tex. Apr. 15, 2026). Accordingly, the Court **DENIES AS MOOT** the parties' respective requests that the Court vacate or uphold § 1.6011-10. But *Drake Plastics* did not vacate § 1.6011-11 (the section classifying certain micro-captives as TOIs), so Ryan's challenge to that section remains properly before the Court.

The Court therefore considers only whether § 1.6011-11 must also be vacated and set aside.

## II.

## LEGAL STANDARDS

*A.    Summary Judgment Standard*

Under Federal Rule of Civil Procedure 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "APA cases are often resolved at summary judgment because whether an agency's decision is arbitrary and capricious is a legal question that the court can usually resolve on the agency record." *Amin v. Mayorkas*, 24 F.4th 383, 391 (5th Cir. 2022) (citation omitted). These cases typically involve "pure questions of law." *Nat'l Ass'n for Gun Rts., Inc. v. Garland*, 741 F. Supp.

3d 568, 597 (N.D. Tex. 2024) (O'Connor, J.) (citation omitted). Accordingly, "the district court applies the APA standards of review to determine whether, as a matter of law, the evidence in the administrative record permitted the agency to make the decision it did." *Id.* (quotation marks and citation omitted).

B.      *APA Review*

In an arbitrary-and-capricious challenge under the APA, a court must determine whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). A rule is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* In sum, agency action must "be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

But "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43; *see Prometheus Radio*, 592 U.S. at 423 (describing arbitrary-and-capricious standard as "deferential"). Although courts may not "supply a reasoned basis for the agency's action that the agency itself has not given," they can "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *State Farm*, 463 U.S. at 43 (citations omitted).

Finally, an agency defending its actions in court is limited to its "contemporaneous explanation in light of the existing administrative record." *Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019) (citations omitted).

### III.

### ANALYSIS

Ryan claims that § 1.6011-11 is arbitrary and capricious in two principal respects. First, Ryan contends that the Treasury's general suspicion of micro-captive transactions is itself unreasonable and lacks supporting facts or data. Doc. 61, Ryan's Br., 13-17. And second, Ryan contends that § 1.6011-11's specific triggering criteria—i.e., the way the Treasury differentiates between micro-captive transactions with a potential for tax avoidance from those that lack such potential—are unreasonable and unreasonably explained. *Id.* at 17-24. Both arguments, for the reasons addressed in subsections B. and C. below, fail. Accordingly, § 1.6011-11 is not arbitrary or capricious.

A.    *Under the Relevant Statutory Scheme, TOIs Can Be Defined Broadly.*

Before reaching Ryan's arguments, the Court first explains aspects of the statute that are relevant to Ryan's arbitrary-and-capricious challenge. In reviewing APA challenges to agency action, a court's role can be summarized as (1) "polic[ing] the outer statutory boundaries" of Congress's delegation to the agency and (2) "ensur[ing] that agencies exercise their discretion consistent with the APA." *Texas v. EPA*, 137 F.4th 353, 365 (5th Cir. 2025) (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024)). On this first point, courts exercise independent judgment to construe the statute granting the agency's authority to obtain its "best meaning." *Id.* at 367 (citation omitted). That reading fixes the outer boundaries of the agency's authority. On the second point, even an action that is within the agency's statutory authority may still be arbitrary and capricious (and thus

violate the APA) if the agency fails to exhibit reasoned decision-making. *See Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 619 (D.C. Cir. 2017) (explaining that an agency's actions "may be consistent with the agency's authorizing statute and yet arbitrary and capricious" if agency did not "engage in reasoned decisionmaking" (citations omitted)).

Although Ryan's remaining cause of action here concerns only this second aspect of the Court's role, to frame Ryan's arguments, the Court also briefly addresses the boundaries of the Treasury's authority. In promulgating § 1-6011-11, the Treasury acted under its authority prescribed by § 6011 and § 6707A in particular. Section 6707A(c)(1) defines reportable transaction as a transaction "of a type" that the Treasury "determines as having a potential for tax avoidance or evasion." And TOIs—a type of reportable transaction—are separately (and circularly) defined by the Treasury as "a transaction that is the same as or substantially similar to one of the types of transactions that the IRS has identified . . . as a [TOI]." § 1.6011-4(b)(6). Thus, the only apparent limitation on the Treasury's authority under § 6707A(c)(1) to classify TOIs is that, because TOIs are reportable transactions, they must be "of a type" that the Treasury believes have a "potential for tax avoidance or evasion." § 6707A(c)(1). *See CIC Servs., LLC v. IRS* (*CIC Servs. I*), No. 3:17-CV-110, 2021 WL 4481008, at *5 (E.D. Tenn. Sept. 21, 2021) (noting that Treasury's definition of TOI "amounts to a catch-all that seemingly grants the IRS unlimited discretion to label any transaction a 'transaction of interest,' and, thus, a 'reportable transaction,' if it believes the transaction has the potential for tax avoidance or evasion").

The statute itself does not define "type" or "potential." But "type" generally indicates something of a particular kind or with distinguishing features. *See, e.g., Type*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/type (last visited June 15, 2026) (providing

definitions of "type" that include "a particular kind, class, or group," or "something distinguishable as a variety"). And Black's Law Dictionary defines "potential" as "capable of coming into being" or "possible if the necessary conditions exist." *Potential*, *Black's Law Dictionary* (12th ed. 2024).[3] Taken together, the Treasury may classify reportable transactions where the transaction is (1) of a particular group ("type") with (2) characteristics making it capable of tax avoidance or evasion if the necessary conditions exist ("a potential"). Thus, the Treasury has broad discretion here to classify TOIs.

Congress appears to have intended this discretion. Compare § 6707A(c)(1)'s expansive language defining reportable transactions with § 6707A(c)(2), which defines listed transactions much more narrowly as those that are "the same as, or substantially similar to" transactions that have been "specifically identified . . . as a tax avoidance transaction." Juxtaposing these two definitions, it is easy to see the conscious choice by Congress to let the Treasury loosely identify TOIs as transactions that may not be, but have a potential for, tax avoidance.

Although the current question is not about whether the Treasury acted within the statutory boundary, understanding Congress's assignment to the Treasury is relevant to determining whether the Treasury engaged in reasoned decision-making. *See State Farm*, 463 U.S. at 43 (requiring "rational connection between the facts found and the choice made" (citation omitted)). An agency cannot obviate its duty to be reasonable—even when acting within its statutory authority. *See Animal Legal*, 872 F.3d at 619 (citation omitted). Understanding how Congress intended an agency to think about the problem is therefore relevant when assessing if the agency thought about the problem reasonably.

---

[3] Although the Court uses recent definitions for each term, neither term's definition appears to have materially changed since the statute was first promulgated in 2004.

B.    *The Treasury's Determination That Some Micro-Captives Could Be Used for Tax Avoidance Was Not Arbitrary or Capricious.*

First, Ryan contends that the Final Rule is arbitrary and capricious because the Treasury's suspicion of micro-captives as vehicles for tax avoidance is unreasonable and lacks a factual basis. *See* Doc. 61, Ryan's Br., 13-17.

Challengers to the IRS Notice (the precursor to the rulemaking that led to the Final Rule challenged here) made these same arguments. In *CIC Services II*, the court considered "whether the IRS 'examined the relevant data' and 'articulated a satisfactory explanation' for its decision to designate micro-captive transactions as a 'transaction of interest' based on the potential for tax avoidance or evasion." 592 F. Supp. 3d at 684-85 (citation omitted). The court found that the IRS Notice was arbitrary and capricious because the IRS's stated awareness and belief that micro-captives had potential for tax avoidance in IRS publications and news releases was not a substitute for "facts or data" to support that belief. *See id.* at 685-87. The IRS had likewise failed to show that it "examin[ed] relevant facts and data" by simply including case law regarding insurance and captive insurance arrangements generally (not limited to micro-captives)—some of which did not even "conclude that the taxpayer engaged in an abusive transaction." *Id.* at 686-87 (citations omitted). The court concluded that "[w]hile the IRS may ultimately be correct that micro-captive insurance arrangements have the potential for tax avoidance or evasion . . . the APA requires that the IRS examine relevant facts and data supporting that conclusion"—which it did not do before issuing the IRS Notice. *See id.* at 687.

Just as it defended the IRS Notice, the Treasury defends the Final Rule in part based on "the IRS's long-standing positions with respect to abusive micro-captives" as reflected in its publications.

90 Fed. Reg. at 3,538. Standing alone, this reason is not a substitute for reviewing facts and data, as the court in *CIC Services II* held. *See* 592 F. Supp. 3d at 685.

But in promulgating the Final Rule, the Treasury also grounded its suspicion in existing caselaw, taxpayer examination data, current litigation involving micro-captives, and "available industry data." *See* 90 Fed. Reg. at 3,538.

Start with the caselaw. The Treasury relied on eight recent Tax Court decisions that each concluded that the micro-captive at issue was abusing § 831(b) by not offering true insurance. Each case is available in the administrative record and is referenced in the Final Rule. *See id.* at 3,538-39. And in each of those cases, the Tax Court found that the micro-captive was not offering true insurance. *See Royalty Mgmt. Ins. Co. v. Comm'r*, T.C.M. (RIA) 2024-087, at *43 (T.C. 2024), *appeal dismissed*, No. 24-9006, 2025 WL 512503 (10th Cir. Jan. 10, 2025); *Patel v. Comm'r*, T.C.M. (RIA) 2024-034, at *51 (T.C. 2024); *Caylor Land & Dev., Inc. v. Comm'r*, 121 T.C.M. (CCH) 1205, at *48-49 (T.C. 2021); *Swift v. Comm'r*, T.C.M. (RIA) 2024-013, at *36 (T.C. 2024), *aff'd*, 144 F.4th 756 (5th Cir. 2025); *Keating v. Comm'r*, T.C.M. (RIA) 2024-002, at *64 (T.C. 2024); *Syzygy Ins. Co. v. Comm'r*, 117 T.C.M. (CCH) 1165, at *45 (T.C. 2019); *Rsrv. Mech. Corp. v. Comm'r*, 115 T.C.M. (CCH) 1475, at *45-46 (T.C. 2018), *aff'd*, 34 F.4th 881 (10th Cir. 2022); *Avrahami v. Comm'r*, 149 T.C. 144, 197 (2017).

The Treasury also claimed reliance on taxpayer examinations, current litigation, and industry data. But the Treasury did not specifically identify or provide this data. Instead, the Treasury generally described its findings from taxpayer examinations in the preamble to the Final Rule. *See* 90 Fed. Reg. at 3,539 (explaining that undisclosed taxpayer examination data reflects "fact patterns that are consistently present" in micro-captives determined to lack the necessary characteristics for

insurance and that those fact patterns are incorporated into the Final Rule). The Treasury explains its failure to provide specific cases or taxpayer examination data by invoking 26 U.S.C. § 6103—a statute that prohibits the Treasury from disclosing taxpayer information except under certain strictly defined circumstances. *See* Doc. 63, Gov.'s Br., 31-34.

The Court is doubtful that the Treasury can simply make broad pronouncements that undisclosed data supports the Final Rule's structure and then hide behind taxpayer confidentiality provisions when scrutinized. The Treasury's reasoning must be "sustainable on the administrative record." *Camp v. Pitts*, 411 U.S. 138, 143 (1973). And the Court "cannot affirm the sufficiency of what [it] cannot see." *Flyers Rts. Educ. Fund, Inc. v. FAA*, 864 F.3d 738, 746 (D.C. Cir. 2017). Nor does the APA include "a confidentiality loophole." *In re NTE Conn., LLC*, 26 F.4th 980, 989 (D.C. Cir. 2022).

The Government correctly points out that it could not simply redact taxpayer identifying information for compliance with § 6103. *See* Doc. 63, Gov.'s Br., 32-33. Indeed, the Supreme Court held the same in *Church of Scientology v. IRS*, 484 U.S. 9, 18 (1987).

However, *Church of Scientology* does not hold that § 6103 prevents the Treasury from disclosing taxpayer information in another non-identifying form. *See id.* at 16-17 (implying that "statistical studies" or "compilations" of data would not run afoul § 6103's confidentiality requirements). And even when protecting confidential data, an agency is still required to disclose "as much information publicly as it can." *Flyers Rts.*, 864 F.3d at 745 (citation omitted). The Treasury's high-level pronouncements that undisclosed taxpayer examination and litigation data also supported the Final Rule did not meet this standard. Thus, to the extent the Final Rule contains

conclusions that purportedly rely solely on undisclosed examination data, those conclusions are not based on facts and data in the record and should not be considered.

Nevertheless, the Court finds that the Treasury's general suspicion of micro-captive transactions was not unreasonable and is based on facts and data in the record. Although the "reasonableness" of this suspicion was in doubt at the time of the IRS Notice, Tax Court litigation between 2017 and 2024 identifies at least eight tax-avoiding micro-captive arrangements of which the Treasury was aware when it promulgated the Final Rule. The Treasury, in recognizing that micro-captives have in fact been used for tax avoidance in recent years, reasonably concluded that at least some micro-captives have a potential for tax avoidance. Whether § 1.6011-11's specific criteria are reasonable is a separate question, addressed next.

C.      *Section 1.6011-11's Criteria Are Not Arbitrary or Capricious.*

Section 1.6011-11 uses three key criteria to differentiate micro-captive transactions with a potential for tax avoidance from transactions lacking that potential: (1) the loss ratio factor, (2) the financing factor, and (3) provision's narrowed definition of captive. Effectively, these three criteria establish two ways that a micro-captive transaction would be a TOI under the Final Rule. First, via the loss ratio factor, if the transaction involved a micro-captive with a loss ratio below 60% over the last ten years (or over its lifetime if less than 10 years); or second, via the financing factor, if the transaction involved a micro-captive that provided capital to a related party in the last five years. *See* § 1.6011-11(b)(2), (c). The third criterion, the definition of captive, merely limits the section's application to transactions involving *closely held* micro-captives. *See* § 1.6011-11(b)(1) (adopting § 1.6011-10's definition of captive).

Together, the Treasury determined that these criteria represented "the best available proxies for potentially tax avoidant transactions." Doc. 63, Gov.'s Br., 19; *see* 90 Fed. Reg. at 3,554-55 (stating that the criteria chosen "strongly indicate tax avoidance or the potential for tax avoidance"); *id.* at 3,555 (concluding that the factors "consistently give[] rise to tax avoidance or otherwise potentially give[] rise to tax avoidance"). Ryan disagrees. It contends that these criteria are unreasonable indicators of tax avoidance potential and that § 1.6011-11 is thus arbitrary and capricious. *See* Doc. 61, Ryan's Br., 18-24.

When reviewing § 1.6011-11's criteria for reasonableness, the Court's role "is not to substitute its judgment for that of the agency." *Indigenous Peoples of Coastal Bend v. U.S. Army Corps of Eng'rs*, 132 F.4th 872, 882 (5th Cir. 2025) (citation omitted). Instead, the Court must "ensure[] that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio*, 592 U.S. at 423 (citations omitted). This standard is deferential. *See id.*

A regulation's overbreadthness alone does not make it unreasonable. *U.S. Sportsmen's All. Found. v. CDC*, 167 F.4th 813, 822 (6th Cir. 2026) (citation omitted). But such "rough justice" will also require a "reasonable justification." *Athens Cmty. Hosp., Inc. v. Shalala*, 21 F.3d 1176, 1180 (D.C. Cir. 1994) (citation omitted) (noting that "[s]ome over- and under-inclusiveness" is not "fatal" to an agency's action where there is a "reasonable justification for administering only rough justice" (citation omitted)).

The Court reviews each of the three challenged criteria in turn and finds that, based on facts and data in the record, § 1.6011-11's criteria are reasonable indicators of a potential for tax avoidance.

1.    Section 1.6011-11's Loss-Ratio Factor is Reasonable.

Under § 1.6011-11, any transaction involving a closely held micro-captive is a TOI if the micro-captive has a loss ratio below 60% over the computation period. *See* § 1.6011-11(b)(2)(ii), (c)(2). The Court first considers whether a low loss ratio reasonably indicates a potential for tax avoidance. The Court then considers whether § 1.6011-11's particular loss-ratio criterion was unreasonable.

As an initial matter, the Treasury's choice of loss ratio as a criterion (without considering the actual percentage selected) was not unreasonable. Low loss ratios, the Treasury explained, indicate that insurance premiums paid by a parent company to its captive are higher than is "reasonably needed to fund insurance operations" or that the captive has "artificially low or nonexistent claims activity." 90 Fed. Reg. at 3,540. Low loss ratios are thus strong indications that a captive may have been employed for a tax-avoidance purpose. *See id.*

The Treasury relied on a litany of data suggesting that micro-captives involved in tax-avoidance schemes invariably have loss ratios falling significantly below industry averages. This included expert reports that "routinely emphasized the low loss ratios in captives determined to be tax avoidant." Doc. 63, Gov.'s Br., 22; *see* Doc. 50-1, Admin. R., at 17,774-75 (concluding that a captive's premiums were excessive in light of claims paid because, while the industry average loss ratio was 70.2%, the captive's loss ratio was 2.29%); *id.* at 17,041 (noting that "near zero loss ratios over . . . 6 years" indicated that captives were not "operating as insurance companies"); Doc. 52-2, Admin. R., at 21,947-48 (concluding that the two captives were either "remarkably" fortunate or pricing premiums too high because their combined loss ratio during a four-year review period was 5.315%, which was dramatically lower than insurance industry averages of around 70%).

The Treasury also relied on micro-captive case law. In two of the eight Tax Court cases identified in the Final Rule, the micro-captives had respective loss ratios of 0% in the years at issue. *See Royalty Mgmt.*, T.C.M. (RIA) 2024-087, at *27-30 (finding micro-captive with a loss ratio of 0% in the two years reviewed was not offering true insurance); *Avrahami*, 149 T.C. at 168-69, 197 (finding that micro-captive with a loss-ratio of 0% was not offering true insurance).

In four of those cases, the micro-captives had loss ratios at or below 5% in the years at issue. *See Patel*, T.C.M. (RIA) 2024-034, at *34, *51 (finding two micro-captives with respective loss ratios of 3% and 5% in the relevant four-year period "did not constitute insurance because they failed to distribute risk and, in the alternative, did not act as an insurer commonly would"); *Keating*, T.C.M. (RIA) 2024-002, at *63-64 (finding that insured's payments to a micro-captive with loss ratios of "0.324%, 3.322%, and 3.019%" in the three years at issue could not be deducted because they were not "for insurance in the commonly accepted sense"); *Caylor Land*, 121 T.C.M. (CCH) 1205, at *25-26 (finding that micro-captive with 0.89% loss ratio in four-year period, and 0.95% loss ratio in two-year period at issue was not entitled to § 831(b) election); *Syzygy Ins.*, 117 T.C.M. (CCH) 1165, at *19, *45 (finding that micro-captive with 1.5% loss ratio in four-year period at issue was not providing true insurance).

In one case, loss ratios ranged between 0.13% and 7.91% over a four-year period. *Swift*, T.C.M. (RIA) 2024-013, at *35-36 (finding that certain micro-captives, who participated in reinsurance pools with loss ratios ranging between "0.13% . . . and 7.91%" in the four-year period at issue, were not offering true insurance because the loss ratios "suggest[ed] that the premiums were priced much higher than what the risks called for"). The highest loss ratio of any micro-captive in the case law was roughly 21%. *See Rsrv. Mech. Corp.*, 115 T.C.M. (CCH) 1475, *17-21 (indicating

that the micro-captive received $1,477,050 over three-year period with only a single claim of $339,820 paid in that time).

Ryan, along with other commenters, pushed back on the Treasury's approach. They contended, and the Treasury acknowledged, that "low loss ratios may be the result of coverage of low-frequency, high severity risks." *See* 90 Fed. Reg. at 3,540-41. Thus, "low loss ratios" are not unique to abusive micro-captives—they are a feature of an entire micro-captive industry where "premiums are intentionally set at high rates for long periods of time to ensure that there are adequate reserves to pay claims in case of catastrophic loss." *Id.* at 3,540. In other words, all micro-captives are likely to have low loss ratios, but only some micro-captives have been employed abusively. Identifying abusive micro-captives by a quality that could apply to every micro-captive would be unreasonable.

Nevertheless, the Treasury believed loss ratio was a proper criterion. It explained: "Inherent in insurance underwriting is the concept that by assuming numerous independent risks that will occur randomly, losses will become more predictable over time, and pricing [of premiums] should reflect those anticipated losses." *Id.* at 3,541 (citing *Clougherty Packing Co. v. Comm'r*, 811 F.2d 1297, 1306 (9th Cir. 1987)). Thus, even micro-captives, offering legitimate insurance, should price premiums in line with the risks being insured. And at some level, a low-enough loss ratio could be a sign that the micro-captive is not doing so. *See id.* (noting that the abusive micro-captives found in the Tax Court cases priced premiums to meet § 831(b)'s target thresholds instead of calibrating premiums based on actual loss estimates). The Treasury was not patently unreasonable in making this assumption, so the Court will not second guess it. Worth restating, based on its assigned task

from Congress, the Treasury did not need to perfectly tailor § 1.6011-11 to cover only abusive transactions—a reportable transaction need only be of a type with a potential for such abuse.

Ryan next argues that even if loss ratios "could be a defensible metric for identifying some abusive micro-captive transactions, the Final Rule offers arbitrary and capricious justifications for the specific . . . 60% loss ratio threshold[]" that the Treasury chose. Doc. 61, Ryan's Br., 19. To be sure, the rate chosen, like the rest of the Final Rule, must be reasonable. But it is not the Court's place to substitute its judgment for the agency's and decide what percentage is the correct ratio. Thus, the Court considers only if the Treasury's choice (here 60%) was reasonable considering the facts and data in the record. And based on the below analysis, the Court finds that the Treasury's chosen loss ratio for TOIs was indeed reasonable and reasonably explained.

In the Proposed Rule, the Treasury based the loss ratios for both listed transactions and TOIs (65% for both) on the NAIC dataset. The Treasury acknowledged that the NAIC dataset was an imperfect source.[4] But as the Treasury explained, the dataset was meant primarily as a starting point. *See* 90 Fed. Reg. at 3,542. To reach § 1.6011-11's 60% loss ratio, the Treasury modified the NAIC dataset to remove certain "high frequency, low severity coverages that captives are unlikely to cover," calculating a ten-year average loss ratio from that data, and lowering from there based on "a discount from the lowest loss ratio supported by the available data." *See id.* The Court sees nothing plainly unreasonable about that approach.

---

[4] One commenter proposed alternative data—the "AM Best" dataset—which included a table illustrating distribution of average loss and loss administration expense ratios for certain small insurance companies. *See* 90 Fed. Reg. at 3,542. Sharing some of the same flaws as the NAIC dataset, the AM Best dataset included "vastly different claims characteristics than micro-captives" and covered lines of business that micro-captives do not. *Id.* But unlike the NAIC dataset, the AM Best dataset was only a "table," not a "published data set" that would be amenable to adjustments. *See id.* Accordingly, the Treasury declined to use it. *See id.* This was not arbitrary or capricious. Agencies are permitted to consider "materially incomplete" data in the absence of better data. *See Prometheus Radio*, 592 U.S. at 425-26.

Ryan contends that the micro-captive case law in the record would support only a much lower loss ratio for TOIs. *See* Doc. 61, Ryan's Br., 20-21.[5] Indeed, not a single Tax Court case in the record reflects an abusive micro-captive with a loss ratio approximating 60%. Two of the cases reflect loss ratios of 0%, four reflect loss ratios below 5%, one case reflects a loss ratio as high as 7%, and one case reflects a loss ratio as high as 21%. *See supra* pp. 21-22. 60% is also substantially higher than the micro-captive loss ratios reflected in the Treasury's expert reports. *See* Doc. 50-1, Admin. R., at 17,774-75 ("2.29%"); *id.* at 17,041 ("near zero loss ratios over . . . 6 years"); Doc. 52-2, Admin. R., at 21,947-48 ("5.315%").

But the loss ratios reflected in each of those sources have limited relevance to the Court's specific inquiry here. In promulgating § 1.6011-11, the Treasury needed only determine whether a loss ratio below 60% could indicate that a transaction had a potential for tax avoidance. *See* § 6707A(c)(1). That actual abusive micro-captive transactions had much lower loss ratios does not mean that some higher loss ratio could not reasonably indicate a mere potential for the same. In addition, the Treasury noted that the Tax Court cases in the record lacked data indicating what each micro-captive's loss ratio would have been over a ten-year period. *See* 90 Fed. Reg. at 3,541. Because § 1.6011-11 would compute loss ratios over a ten-year period where possible, *see* 1.6011-11(b)(2)(ii), and most of the Tax Court cases analyzed only a two-to-four-year period, *see supra* pp. 21-22, it is difficult to make direct comparisons.

Still, in response to criticisms that the loss ratios in the Proposed Rule were too high, the Treasury did significantly lower the loss ratio *for listed transactions* from 65% (also initially based on the modified NAIC dataset) to 30%. The Treasury did so with reference to another case: *R.V.I.*

---

[5] Commenters made this same argument in response to the Proposed Rule. *See* 90 Fed. Reg. at 3,541.

*Guaranty Co. v. C.I.R.*, 145 T.C. 209 (2015). *See* 90 Fed. Reg. at 3,541. As relevant to Ryan's arguments here, in *R.V.I.*—despite the subject insurance company's low loss ratios in the years surveyed—the Tax Court found that the insurance company was providing insurance in its "commonly accepted sense" with true "insurance risk." *R.V.I.*, 145 T.C. at 234, 246. As calculated by the Treasury, the subject insurance company had an average ten-year loss ratio of 32% (with a loss ratio around 1% in several years). *See* 90 Fed. Reg. at 3,541 (citing *R.V.I.*, 145 T.C. at 216). Thus, Ryan contends, *R.V.I.* demonstrates that even a genuine insurance company can have a loss ratio below 1% in several years and a ten-year loss ratio well below 60%. *See* Doc. 61, Ryan's Br., 19-20.

But the Treasury's decision to lower the proposed loss ratio for listed transactions from 65% to 30%, and the *R.V.I.* case itself, do not render § 1.6011-11's 60% loss ratio unreasonable. First, the Treasury's decision to treat listed transactions differently than TOIs merely reflects the stark difference between the statutory definitions for the two types of reportable transactions. Unlike TOIs, which purport to identify a potential for tax avoidance, listed transactions must be "the same as, or substantially similar to" transactions that have been "specifically identified . . . as a tax avoidance transaction." § 6707A(c)(2). Thus, the Treasury's modifications to the listed transaction criteria were an attempt to meet that higher standard—not an admission that a 60% loss ratio could not still indicate a potential for tax avoidance. And second, like the Tax Court cases analyzed above, *R.V.I.*'s relevance to § 1.6011-11's 60% loss ratio is limited. The fact that a genuine insurance company could have a loss ratio well below 60% does not, without more, indicate that a micro-captive with a higher loss ratio lacks a reasonable potential for tax avoidance. As the *Drake Plastics*

court observed, "*R.V.I.* does not speak to the reasonableness or suspiciousness" of the loss ratios relevant to the Final Rule. 2026 WL 1021379, at \*22 n.8.

At best, *R.V.I.* and the other Tax Court cases identified demonstrate that § 1.6011-11's 60% loss ratio is overinclusive. But overinclusiveness alone does not render a regulation arbitrary and capricious unless there is no reasonable explanation for the regulation's scope. *See U.S. Sportsmen's*, 167 F.4th at 822. Section 1.6011-11 need only identify transactions "of a type" with a *potential* for tax avoidance. *See* § 6707A(c)(1). Thus, as a general matter, Congress's broad delegation to the Treasury itself seems to presume some overinclusiveness. And as discussed above, both the Treasury's reliance on the modified NAIC dataset and its explanation for why Tax Court cases did not require a lower loss ratio were reasonable. Accordingly, the Treasury reasonably selected a 60% loss ratio for § 1.6011-11.

For the reasons explained above, § 1.6011-11's loss-ratio factor is not unreasonable.

2.    Section 1.6011-11's Financing Factor is Reasonable.

As an alternative to the loss-ratio factor, § 1.6011-11 classifies any transaction involving a closely held micro-captive as a TOI if the micro-captive has, in its most-recent five taxable years, provided financing to an owner, insured, or related person. *See* § 1.6011-11(b)(2)(i), (c)(1). As the Treasury explained, related-party financing could allow taxpayers to pay premiums to their micro-captives and deduct those premiums as business expenses, then access those same funds again through financing arrangements. *See* 90 Fed. Reg. at 3,546. This can result in an "indefinite deferral of tax." *Id.* The Treasury pointed out that related-party financing was present in at least three of the eight micro-captive Tax Court cases identified. *See id.* (first citing *Avrahami*, 149 T.C. at 169-71; then *Swift*, T.C.M. (RIA) 2024-013 at \*18-19; and then *Patel*, T.C.M. (RIA) 2024-034, at \*11).

-26-

Challenging **§** 1.6011-11's financing factor, Ryan makes two principal arguments. First, that the Treasury had insufficient support in the record for its determination that related-party financing has a potential for tax avoidance. *See* Doc. 61, Ryan's Br., 22. And second, that because the Treasury acknowledged that related-party financing alone may not be tax avoidance, the Treasury's decision to make related-party financing a stand-alone indicator of a potential for tax avoidance was internally inconsistent. *See id.* at 22-23. Neither argument holds weight here.

As to the first argument, Ryan cites several Tax Court cases in the record that it contends "confirm that related-party financing can be proper," including *Avrahami* and *Rent-A-Center, Inc. v. Commissioner*, 142 T.C. 1 (2014). *See* Doc. 61, Ryan's Br., 22. But neither case stands for the proposition that related-party financing cannot signal a potential for tax avoidance. The Treasury's principal concern with related-party financing arrangements was that they enable a "circular flow of funds"—from a parent company to its captive as premiums, and then back to the parent company as financing—to perpetually defer both parties' tax obligations. *See* 90 Fed. Reg. at 3,546. Even in *Avrahami*, where the Tax Court found that the related-party financing presented was itself legitimate (although the micro-captive itself was not), the court acknowledged those associated concerns. *See* 149 T.C. at 168-171 (analyzing related-party transaction and noting that "[i]nsurance regulators often raise their bureaucratic eyebrows at related-party dealings like this"). And although the Tax Court in *Rent-A-Center* found no issue with the particular related-party financing presented there, it did so only after a fact-intensive inquiry into the arrangement. *See* 142 T.C. at 11-13. The *Rent-A-Center* court's analysis belies the assertion that such transactions are not suspicious.

Like Ryan's challenge to the loss-ratio factor, Ryan's first argument here at best indicates that the financing factor may be overbroad. But once again, that overbreadthness is not automatically

unreasonable. When promulgating § 1.6011-11, the Treasury knew that certain tax-avoiding micro-captives *had* engaged in related-party financing. In addition to *Avrahami*, several other Tax Court cases in the record show that micro-captives that were not offering true insurance used related-party financing to achieve circular funding. *See, e.g.*, *Swift*, T.C.M. (RIA) 2024-013, at *18-19; *Patel*, T.C.M. (RIA) 2024-034, at *11; *Keating*, T.C.M. (RIA) 2024-002, at *54-56 (finding that micro-captive was not operating as insurance in commonly accepted sense due in part to the "near-circular flow of funds" presented). An expert report in the record assessed that over 99% of the premiums paid to the micro-captives in *Swift* came back into the parent company's control. *See* Doc. 52-2, Admin. R., at 21,977. Similarly, an expert report related to *Keating* observed that the circular flow of funds presented there did "not remotely approach the economics of any insurance company" of which the expert was aware. *See* Doc. 50-1, Admin. R., at 17,828. Therefore, the Treasury reasonably determined that circular funding is one sign that a micro-captive may not be operating as a true insurance company and thus, by utilizing § 831(b) regardless, could be facilitating tax avoidance. *See* 90 Fed. Reg. at 3,546. This conclusion adequately supports the Treasury's ultimate decision that related-party financing reflects a potential for tax avoidance.

Now to Ryan's second argument. The Treasury and IRS agreed that "the presence of related-party financing in a micro-captive transaction by itself may not rise to the level of tax avoidance, as it may be that such financing" is obtained at arm's length or is otherwise bona fide. *See id.* The Treasury went so far as to state that although related-party financing could allow a parent company to continuously defer tax obligations through circular funding arrangements, "[s]uch deferral *should not be considered tax avoidance* unless coupled with the continued accumulation of tax-deferred

amounts in a transaction involving circumstances inconsistent with insurance for Federal tax purposes." *Id.* (emphasis added).

With this principle in mind, the Treasury modified the factors for listed transactions by creating a conjunctive test: a micro-captive transaction could not be a listed transaction under the Final Rule unless it satisfied *both* the loss ratio and related-party financing factors. *See id.*; § 1.6011-10(c). But the Treasury did not similarly modify § 1.6011-11: a transaction with a closely-held micro-captive that recently engaged in related-party financing is a reportable TOI regardless of whether it also had a low loss ratio. *See* 90 Fed. Reg. at 3,546.

Ryan, observing both the Treasury's admissions and decision not to make § 1.6011-11's financing and loss-ratio factors conjunctive, contends that the Treasury is acting inconsistently, and thus unreasonably. *See* Doc. 61, Ryan's Br., 22-23. But there is no contradiction. The Treasury's admission was only that related-party financing *itself* may not be tax avoidance if the micro-captive is otherwise offering true insurance. *See* 90 Fed. Reg. at 3,546. The Treasury did not say that related-party financing cannot serve as a sign that a given transaction may have potential for tax avoidance. And that is all that § 6707A(c)(1) requires.[6] As the Treasury concluded, irrespective of other factors, the "potential for tax avoidance still exists when there is related-party financing." 90 Fed. Reg. at 3,546.

Accordingly, § 1.6011-11's financing factor is not arbitrary or capricious.

---

[6] Again, the Treasury's decision to make the criteria for listed transactions conjunctive reflects that the Treasury is doing more in an attempt to reach the higher bar it must meet for listed transactions. *See* § 6707A(c)(2) (emphasis added). Other reportable transactions, like TOIs, do not have the same high standard.

3.      Section 1.6011-11's Definition of Captive is Reasonable.

Finally, Ryan challenges the Final Rule's definition of captive. Section 1.6011-11's reporting requirements only apply to transactions involving closely held micro-captives—those with "at least 20 percent of the entity's assets," voting power, or value directly or indirectly owned by an owner, insured, or related person. *See* § 1.6011-10(b)(1)(iii); § 1.6011-11(b)(1). Ryan contends that the Treasury offered "no explanation for this decision" to target closely held micro-captives over others. *See* Doc. 61, Ryan's Br., 23-24.

But the Treasury did offer an explanation. The Final Rule's definition of captive "was intended to exclude entities such as . . . mutual insurers" because they are more likely to have a more diversified ownership and thus a significantly reduced potential for tax avoidance. 90 Fed. Reg. at 3,555. And by focusing on closely held micro-captives, the Final Rule focuses on transactions where "there is little to no barrier to the manufacture of claims in these arrangements." *Id.* at 3,551.

In addition, even Ryan acknowledges that "most micro-captives are owned by and insure only their owners." Doc. 64, Ryan's Reply, 17 (other citation omitted) (citing Doc. 49-2, Admin. R., at 14,681). So, irrespective of its purpose, the Final Rule's focus on closely held micro-captives appears to have a minimal impact on § 1.6011-11's scope.

In sum, § 1.6011-11's definition of captive is reasonable and reasonably explained.

*          *          *

Section 1.6011-11's criteria are not arbitrary and capricious because they serve as reasonable indicators that a given transaction has a potential for tax avoidance.

-30-

D.      *The Court Does Not Order Injunctive or Other Relief.*

Because the Court upholds § 1.6011-11, it does not provide Ryan's requested relief related to that portion of the Final Rule. And to the extent Ryan seeks vacatur or declaratory relief regarding the other portion of the Final Rule addressing listed transactions (§ 1.6011-10), the *Drake Plastics* court's decision has mooted Ryan's request.

The Court also declines Ryan's request that the Court "order that the IRS return all documents and information [that Ryan and its clients] produced pursuant to" the Final Rule. Doc. 61, Ryan's Br., 25 (citing *CIC Servs. II*, 592 F. Supp. 3d at 688). First, Ryan has not explained how the IRS could return raw "information." Second, Ryan does not argue or show that documents and information produced pursuant to § 1.6011-10, which has been vacated, are unique from that produced pursuant to § 1.6011-11, which has not been vacated. *See Drake Plastics*, 2026 WL 1021379, at *25. And third, Ryan's request improperly seeks relief for third parties not before the Court. *See Texas v. United States*, 126 F.4th 392, 420 (5th Cir. 2025) ("Remedies must be tailored to redress a plaintiff's injury, and . . . injunctions should not provide more relief than necessary to give the prevailing party the relief to which it is entitled." (citation modified)).

**IV.**

**CONCLUSION**

For the foregoing reasons, the Court **DENIES** Ryan's Motion for Summary Judgment (Doc. 60) and **GRANTS** the Government's Motion for Summary Judgment in part (Doc. 62). A final judgment will follow.

SO ORDERED.

SIGNED: June 26, 2026.

_____
JANE J. BOYLE
SENIOR UNITED STATES DISTRICT JUDGE